**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 14 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

JAN E. JURASEK,

    Plaintiff-Appellant,

    v.

UTAH STATE HOSPITAL; K.V.
GREENWOOD, Adult II Psychiatrist;
JOHN NILSEN, individually and as
psychiatrist, Utah State Hospital;
MARK PAYNE, individually and as
Administrative Superintendent, Utah
State Hospital; CRAIG HUMMEL,
individually and as Clinical Director,
Utah State Hospital; BRUCE A.
GUERNSEY, individually and as
psychiatrist, Utah State Hospital; and
DR. JAMES HARDY, individually and
as psychiatrist, Utah State Hospital,

    Defendants-Appellees.

---

AMERICAN ORTHOPSYCHIATRIC
ASSOCIATION ("AOA"),

    Amicus Curiae.

No. 97-4082

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 91-CV-979)**

---

Linda V. Priebe, Brazelon Center for Mental Health Law, of Washington, D.C. (Erin Bradley Yeh, Disability Law Center, of Salt Lake City, Utah, with her on the brief), for the appellant.

Debra J. Moore, Assistant Utah Attorney General, of Salt Lake City, Utah, for the appellees.

John Townsend Rich and Jodi L. Short, Shea & Gardner, of Washington, D.C., on the brief for amicus curiae.

---

Before **BRISCOE**, **McWILLIAMS**, and **MURPHY**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Jan Jurasek appeals the district court's entry of summary judgment in favor of defendants in this action brought under 42 U.S.C. § 1983. Jurasek, who was civilly committed and hospitalized for mental illness, claimed defendants violated his rights under the Due Process Clause of the Fourteenth Amendment and his rights of free expression under the First Amendment by forcibly medicating him with psychotropic drugs. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

Jurasek is a paranoid schizophrenic who was civilly committed to the Utah State Hospital on April 12, 1991. At the commitment hearing, a Utah state court determined (1) Jurasek suffered from a mental illness, (2) Jurasek posed an immediate physical danger to himself and others because of his mental illness, (3)

-2-

Jurasek lacked the ability to engage in rational decision-making regarding the acceptance of mental treatment, (4) there was no appropriate less-restrictive alternative to a court order of commitment, and (5) the Hospital could provide Jurasek with adequate and appropriate treatment. Jurasek was examined by an independent psychiatrist prior to the commitment hearing and was represented by counsel at the hearing. The original commitment was slated to last six months. At the conclusion of the six months, a Utah state court reviewed Jurasek's commitment and, after finding the five requirements for civil commitment continued to exist, entered an order extending his commitment for an indeterminate period. Jurasek remains confined at the Hospital pursuant to this commitment order.

Jurasek has been treated with psychotropic drugs from the time he was first admitted to the Hospital. He has continuously objected to the treatment and it has been administered against his will. Since September 1991, the Hospital has had a series of policies which apply to patients who are involuntarily medicated. Under the current policy, patients can be forcibly injected with psychotropic drugs if the Hospital's involuntary medication hearing committee determines "the patient is, or will be, gravely disabled and in need of medication treatment or continuing medication treatment," or "without the medication treatment or continuing medication treatment, the [patient] poses or will pose, a likelihood of serious

harm to himself/herself, others, or their property." Appellees' Br., Addendum C at § 6.9. This policy applies to all patients, including patients with legal guardians.

The involuntary medication hearing committee consists of a psychiatrist, a psychologist, and the hospital program administrator. None of the committee members are to be involved in the patient's treatment at the time the decision is made to forcibly medicate the patient; however, committee members "are not disqualified from sitting on the committee if they have treated or diagnosed the patient in the past." Id. at § 5.2. It is undisputed that none of the committee members involved in the multiple decisions to forcibly medicate Jurasek were part of his treatment team at the time of the decisions.

In September 1991, Jurasek filed the instant lawsuit in federal district court seeking injunctive relief and damages on the theory that his subjection to forced medication violated his Fourteenth Amendment due process and First Amendment free expression rights under the Constitution. Defendants responded they had not violated Jurasek's constitutional rights and, even if they had, the doctrine of qualified immunity absolved them of liability. In April 1997, the district court denied Jurasek's request for injunctive relief and granted defendants' motion for summary judgment.

## II.

This court reviews a grant of summary judgment de novo, applying the same legal standard used by the district court. Sundance Assocs., Inc. v. Reno, 139 F.3d 804, 807 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. If there is no genuine issue of material fact in dispute, then we next determine if the substantive law was correctly applied by the district court." Wolf v. Prudential Ins. Co., 50 F.3d 793, 796 (10th Cir. 1995) (internal citation and quotations omitted).

## III.

It is well established that an individual has a liberty interest in "avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Washington v. Harper, 494 U.S. 210, 221-22 (1990); see Walters v. Western State Hosp., 864 F.2d 695, 698 (10th Cir. 1988). It is also well established that when an individual is confined in a state institution, individual liberties must be balanced against the interests of the institution in

preventing the individual from harming himself or others residing or working in the institution. Harper, 494 U.S. at 222-23; Bee v. Greaves, 744 F.2d 1387, 1394 (10th Cir. 1984) ( Bee I).[1] In Harper, the Supreme Court applied this balancing test and concluded "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will[] if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." 494 U.S. at 227. The question presented in the instant case is different from that in Harper because Jurasek is not a prison inmate, but a civilly-committed patient who has been adjudicated incompetent. Further, Jurasek is medicated because he is "gravely disabled," while Harper was medicated because he was "dangerous to himself or others." Although the policy at issue in Harper also allowed the prison to medicate prisoners who were "gravely disabled," the Supreme Court did not pass on that part of the policy.

The parties agree Jurasek has a liberty interest in avoiding the unwanted administration of antipsychotic drugs. Presumably, they would also agree the

---

[1]In Bee I, we noted in the context of recognizing a plaintiff's liberty interests that the forcible administration of antipsychotic drugs "raises First Amendment concerns" as well because such drugs "have the capacity to severely and even permanently affect an individual's ability to think and communicate." 744 F.2d at 1394. Even if, as Jurasek claims, the forcible administration of antipsychotic drugs triggers First Amendment rights, such rights are subject to the same balancing test as liberty interests. Courts thus must determine whether the individual's rights are "outweighed by the demands of an organized society." Id.

state has a legitimate interest in the health and safety of its patients and employees. However, the parties disagree over how to balance Jurasek's due process rights with the Hospital's interests in health and safety. We conclude the standards established in Harper for involuntarily medicating prisoners strike the appropriate balance. Accordingly, the Due Process Clause allows a state hospital to forcibly medicate a mentally ill patient who has been found incompetent to make medical decisions if the patient is dangerous to himself or others and the treatment is in the patient's medical interests.

Our conclusion is based on the fact that treatment with psychotropic drugs is not punishment. If such treatment was considered punitive, involuntarily-committed mental patients would undoubtedly be entitled to greater due process rights before being forcibly treated. See Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982) ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."). The lack of punishment in the context of forced medication, however, removes any need to provide involuntarily-committed patients with greater due process protection than prisoners. Moreover, unlike prisoners, involuntarily-committed patients have been adjudicated incompetent in a prior formal proceeding, thereby minimizing the potential for any abuse.

Our reasoning is further supported by the Supreme Court's application of the principles enunciated in Harper to a pretrial detainee who had been found incompetent to stand trial, but had not been civilly committed. See Riggins v. Nevada, 504 U.S. 127, 135 (1992). Like a mentally incompetent patient involuntarily committed at a mental health hospital, pretrial detainees have not been convicted of any crime. One could argue that because a pretrial detainee has not been convicted of a crime, he deserves greater due process protections than a prisoner. The Court, however, implicitly rejected this argument in Riggins by applying the Harper standards to an incompetent pretrial detainee. See also Morgan v. Rabun, 128 F.3d 694, 697 (8th Cir. 1997), cert. denied, 118 S. Ct. 1809 (1998) (applying Harper to forcibly medicate an insanity acquittee found incompetent and ordered committed to mental institution because "governmental interests in running a state mental hospital are similar in material aspects to that of running a prison"); Noble v. Schmitt, 87 F.3d 157, 161-62 (6th Cir. 1996) (applying Harper to involuntarily-committed mental patient's case without discussion of differences in status between a prisoner and a civilly-committed mental patient).

In deciding to forcibly medicate Jurasek, the Hospital committee determined Jurasek was "gravely disabled." The Hospital's medication policy defines a "gravely disabled" patient as one who:

-8-

suffers from a mental disorder such that he or she (a) is in danger of serious physical harm resulting from a failure to provide for his [or her] essential human needs of health or safety, or (b) manifests, or will manifest, severe deterioration in routine function evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

Appellees' Br., Addendum C at § 6.9.1. Jurasek argues this assessment did not justify the committee's decision because the Supreme Court has only authorized forced medication of a mentally ill patient when a hospital determines the individual "poses a 'likelihood of serious harm' to himself, others, or their property." Jurasek also contests the Hospital's reliance on the commitment court's decision that he posed an immediate danger of physical injury to himself and others, and challenges the committee's determination that treatment with psychotropic drugs is in his medical best interests. We consider each argument in turn.

**Grave disability**

In Harper, the Department of Corrections mental health policy permitted officials to forcibly treat prisoners with psychotropic drugs if the prison medical committee determined (1) the patient suffered from a mental disorder, (2) treatment was in the patient's medical interests, and (3) the patient either posed a "likelihood of serious harm" to himself, others, or their property, or suffered from

a "grave disability." 494 U.S. at 215. Harper was medicated under the "likelihood of serious harm" prong of the policy. Thus, the Supreme Court did not specifically determine whether a confined individual found to suffer only from a "grave disability" may be forcibly medicated within the framework of the Fourteenth Amendment.

Nevertheless, the Court's subsequent discussion of the Harper requirements in Riggins sheds some light on this issue. In Riggins, the Court observed that "[u]nder Harper, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a *finding of overriding justification* and a determination of medical appropriateness." 504 U.S. at 135 (emphasis added). The Court held due process requires the state to establish "treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, *essential for the sake of Riggins' own safety or the safety of others*." Id. (emphasis added). These statements in Riggins suggest the Court believes a finding of "overriding justification" is more inclusive than the specifically listed criteria in the forced medication policy language at issue in Harper. An individual's classification as "gravely disabled," at least under the definition applied by the Hospital to Jurasek, provides a sufficiently overriding justification for involuntary medication.

Our next task is to examine the language of the Hospital's medication policy to determine whether it appropriately limits the circumstances in which a patient can be medicated against his will. A patient who is "in danger of serious physical harm," Policy § 6.9.1,   is undoubtedly in need of treatment "for the sake of [his or her] own safety." See Riggins, 504 U.S. at 135. Moreover, a patient who is not receiving care "essential for his or her health or safety," Policy § 6.9.1, is, by definition, in need of treatment "for the sake of [his or her] own safety." See Riggins, 504 U.S. at 135. We thus conclude the Court's discussion in Riggins implicitly authorizes the forced medication of involuntarily-committed individuals designated as "gravely disabled" under the definition at issue here. The Hospital's actions are justified.  [2]

Having determined Jurasek can be medicated pursuant to the "grave disability" prong of the Hospital's forced medication policy, we need not consider whether Jurasek's condition implicates the policy's "poses an immediate danger of physical injury to others or himself" component. We note, however, the commitment court's determination in 1991 that Jurasek "poses an immediate

---

[2] Jurasek's reliance on Woodland v. Angus, 820 F. Supp. 1497 (D. Utah 1993), is misplaced. In Woodland, the court determined the Hospital's December 1991 policy was unconstitutional because it did "not require a finding that [the patient] is dangerous to himself, other, or property." Id. at 1518. As explained above, under the current Hospital policy, a finding that a patient is "gravely disabled" *includes* a determination that the patient is "dangerous to himself;" therefore, the policy is constitutional under Harper.

-11-

danger of physical injury to others or himself . . . if allowed to remain at liberty"
is of dubious relevance to Jurasek's *current* dangerousness. See Davis v.
Hubbard, 506 F. Supp. 915, 935 (N.D. Ohio 1980). A commitment court's
determination is temporal. The court is required to determine whether an
individual "poses an *immediate* danger of physical injury to others or himself."
Utah Code Ann. § 62A-12-234(10)(b) (emphasis added). Thus, a hospital may not
rely on a commitment court's determination unless such an assessment was made
close in time to the hospital's decision to medicate.

**Medical best interests**

Jurasek next argues treatment with Haldol is not in his medical best
interests. In early 1993, Hospital officials determined Jurasek's condition was not
improving as well as they would have liked with treatment by Haldol and they
began treating him with Prolixin. In April 1996, however, apparently dissatisfied
with the Prolixin results, the Hospital discontinued the Prolixin treatment and
resumed medicating Jurasek with Haldol. Once a patient objects to the forcible
administration of antipsychotic medication, the state bears the burden of
establishing the continued need and medical appropriateness of the treatment.
See Riggins, 504 U.S. at 135.

-12-

The Hospital's involuntary medication hearing committee, comprised of psychologists and psychiatrists not involved in Jurasek's treatment, has consistently determined treatment with psychotropic drugs is in Jurasek's medical best interests. One of Jurasek's treating physicians also testified that Jurasek became increasingly agitated when the Hospital stopped treating him with psychotropic drugs. Another reported the medications Jurasek "is taking are not effective in curtailing his psychotic symptomatology; however they are decreasing somewhat the intensity of his symptoms." Record II, Doc. 137, Exh. I, at 3. The fact that a particular method of treatment fails to yield the type of results officials envisioned does not mean the treatment is inconsistent with the patient's medical best interests. In sum, the evidence in the record is uncontroverted that psychotropic drugs have been, at all times, at least partially beneficial in Jurasek's treatment.

Because Jurasek has been adjudicated gravely disabled and treatment with psychotropic drugs has been found to be in his medical best interests, the Hospital may treat him with psychotropic drugs without employing further substantive due process protections. Of course, the Hospital must afford him procedural due process before administering such treatment. In Harper, the Supreme Court found the hospital had provided the mentally ill prisoner with procedural due process by employing procedures substantially similar to those used here. 494 U.S. at 228-

36. Both policies require a committee of independent medical personnel to examine whether the patient should be treated with psychotropic drugs, permit the patient to appeal the committee's decision to a hospital official, authorize the patient to be present at the hearing with an advisor, and allow the patient to present evidence and cross-examine witnesses. Further, if the committee finds the patient should be medicated, the policies require that the committee support its decision with adequate documentation. In sum, we conclude the Hospital provided Jurasek with procedural due process.

IV.

Jurasek insists that, even if Harper applies, his due process rights were violated because he has not been determined incompetent to make medical decisions on his own behalf. Specifically, he argues his 1991 commitment hearing focused only on whether he should be involuntarily committed and he is entitled to a separate hearing to adjudicate his competency to make medical decisions. The Hospital claims the commitment court's finding that Jurasek "lacked the ability to engage in a rational decision making process regarding the acceptance of mental treatment" constitutes a finding that Jurasek is incompetent to make medical decisions on his own behalf. We agree with the Hospital's interpretation.

There could hardly be a clearer finding of Jurasek's inability to make medical decisions on his own behalf than that found by the commitment court. If Jurasek believes the commitment court's determination was wrong or is now obsolete because of changed circumstances, he can request a review hearing. See Utah Code Ann. §§ 62A-12-234(11)(c), 62A-12-242 (local mental health authority required to reexamine factual predicate for indeterminate commitment orders at six-month intervals). In fact, the record reveals Jurasek has exercised his right to reexamination at least once and that another state court judge determined he continued to satisfy the requirements for commitment listed in § 62A-12-234. See Record I, Doc. 136, Exh. E. [3]

## V.

Jurasek further suggests Harper does not apply because he is entitled to the substituted judgment of a legal guardian. Judy Lord was appointed Jurasek's guardian in 1988. She instructed the Hospital to stop medicating Jurasek on January 27, 1994, and the Hospital initially complied. However, shortly

---

[3] Jurasek contends "the periodic civil commitment review hearings in Utah are[] limited to evaluating whether the patient would constitute a danger if released." (Appellant's Br. at 27). This is an inaccurate statement of Utah law. See Utah Code Ann. § 62A-12-242 ("Any patient committed pursuant to Section 62A-12-234 is entitled to a reexamination of the order for commitment on the patient's own petition, or on that of the legal guardian, . . . to the district court of the county in which the patient resides or is detained."); see also Record I, Doc. 136, Exh. E (Jurasek's review hearing officer found all five conditions listed in § 62A-12-234 continued to exist).

-15-

thereafter, the Hospital revised its involuntary medication policy to permit the committee to override Lord's direction. Citing Cruzan v. Director, Mo. Dep't of Health, 497 U.S. 261 (1990), Jurasek argues a mentally ill person who is involuntarily committed under the Utah Mental Health Code has a right to have a legal guardian make medical decisions that are inconsistent with treatment determined appropriate by the hospital.

In Cruzan, the Court held that before allowing a guardian to withdraw hydration and nutrition from an incompetent person in such a way as to cause death, Missouri could constitutionally require clear and convincing evidence of the incompetent patient's wishes. The Court's decision assumed a competent person has a constitutional right to refuse lifesaving hydration and nutrition. More importantly for our purposes, the Court assumed the guardian had the right to make such a decision if "clear and convincing evidence" of the patient's wishes existed. Id. at 279-80. Jurasek argues Cruzan stands for the proposition that an incompetent patient has an absolute right to a guardian's "substituted judgment."

Jurasek's reading of Cruzan is incorrect for two reasons. First, he ignores the fact that the Court merely *assumed for purposes of the opinion* that a guardian, in certain circumstances, has the right to discontinue lifesaving hydration and nutrition for his or her ward. Second, the gist of the court's ruling was even if the guardian had such a right, *that right could be outweighed by the*

*state's interests in preserving life*, absent clear and convincing evidence that the ward's wishes are consistent with the guardian's intentions.

The Supreme Court in <u>Harper</u> specifically considered the issue of an incompetent person's entitlement to the substituted judgment of a guardian. Although the opinion is not clear as to whether Harper sought the substituted judgment of a legal guardian or a judicial officer, the Court unambiguously declared:

> The alternative means proffered by respondent for accommodating his interest in rejecting the forced administration of antipsychotic drugs do not demonstrate the invalidity of the State's policy. Respondent's main contention is that, as a precondition to antipsychotic drug treatment, the State must find him incompetent, and then obtain court approval of the treatment using a "substituted judgment" standard. The suggested rule takes no account of the legitimate governmental interest in treating him where medically appropriate for the purpose of reducing the danger he poses. *A rule that is in no way responsive to the State's legitimate interests is not a proper accommodation, and can be rejected out of hand*.

494 U.S. at 226 (emphasis added).

Moreover, Jurasek has no absolute right to the "substituted judgment" of a guardian under Utah law. We acknowledge, of course, that a state may confer more comprehensive due process protections upon its citizens than does the federal government.

> Where a State creates liberty interests broader than those protected directly by the Federal Constitution, the procedures mandated to protect the federal substantive interests . . . might fail to determine the actual procedural rights and duties of persons within the State.

> Because state-created liberty interests are entitled to the protection of the federal Due Process Clause, the full scope of a patient's due process rights may depend in part on the substantive liberty interests created by state as well as federal law. Moreover, a State may confer procedural protections of liberty interests that extend beyond those minimally required by the Constitution of the United States. If a State does so, the minimal requirements of the Federal Constitution would not be controlling, and would not need to be identified in order to determine the legal rights and duties of persons within that State.

Mills v. Rogers, 457 U.S. 291, 300 (1982) (internal citations omitted). The mere existence of a state regulatory scheme, however, does not mean the state has forged a liberty interest. Such regulations take on constitutional significance only if they employ "explicitly mandatory language in connection with requiring specific substantive predicates." Hewitt v. Helms, 459 U.S. 460, 472 (1983).

The Utah guardianship statute provides that a guardian of an incapacitated person has only those "powers, rights, and duties respecting the ward granted in the order of appointment." Utah Code Ann. § 75-5-312(1). [4] The Utah legislature has statutorily expressed its preference for limited guardianships. See id. § 75-5-304(2) (courts "shall prefer a limited guardianship and may only grant a full guardianship if no other alternative exists"). If an order of appointment is not limited, the state vests guardians with specific "powers and duties" subject to

---

[4] The order appointing Lord as guardian for Jurasek is not in the record. Lord testified she believed the guardianship order required her to act as a "go between" for Jurasek in his dealings with the Hospital. See Record VI at 6-7.

modification by order of the court.      Id. § 75-5-312(2).  Relevant here is the provision under which a "guardian      may give any consents or approvals that may be necessary to enable the ward to receive medical or other professional care, counsel, treatment or service."      Id. § 75-5-312(2)(c) (emphasis added).

Contrary to Jurasek's argument, this statute does not create a liberty interest.  Its terms are entirely permissive in nature and do not      *require* hospital officials to secure a guardian's consent or approval prior to administering medical treatment to an incompetent patient under their control.  The Eighth Circuit, in fact, recently found discretionary language in a similar statute to be an insurmountable impediment to a plaintiff's state law-based due process claim. See Morgan , 128 F.3d at 698-99 (Missouri law providing mental facility "      may authorize the medical and surgical treatment of a patient or resident . . . [u]pon consent of a parent or legal guardian" does not create federally protected liberty interest).  Nor does the Hospital's Statement of Patient Rights or Involuntary Medication of Civilly-Committed Patients Policy contain any language mandating that the Hospital obtain the consent of Jurasek's guardian before forcibly

-19-

medicating him with standard psychotropic drugs.[5] Accordingly, we find the district court correctly rejected Jurasek's due process claim.

## VI.

Based on the preceding analysis, we also agree with the district court that defendants are shielded from liability pursuant to the qualified immunity doctrine. Qualified immunity protects government officials "performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, when a defendant asserts a qualified immunity defense, the plaintiff may proceed to trial only by demonstrating defendant's actions violated a constitutional or statutory right, and the constitutional or statutory right was clearly established at the time of the controverted conduct. Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995).

Our first task in evaluating a defendant's qualified immunity claim is to determine whether the plaintiff has alleged any constitutional or statutory

---

[5]The Statement of Patient Rights compels hospital officials to procure a guardian's consent only before having the patient participate in research projects, conducting surgical or hazardous assessment procedures, administering the patient with "unusual medications" or electroconvulsive therapy, using audiovisual equipment on the patient, and performing procedures for which consent is required by law. (Pl.'s Mot. for Partial Summ. J., Ex. F, ¶ 17).

violation.  <u>County of Sacramento v. Lewis</u>, 118 S. Ct. 1708, 1714 n.5 (1998).

Only if the plaintiff crosses this threshold do we examine "whether the right

allegedly implicated was clearly established at the time of the events in question."

<u>Id.</u>  Having concluded defendants did not contravene any of Jurasek's

constitutional or statutory rights, we find defendants are entitled to qualified

immunity.

VII.

We AFFIRM the district court's order granting summary judgment in favor

of defendants.