Sylvia TANDY, et al., Plaintiffs,

v.

CITY OF WICHITA, Defendant.

No. 01–1097–FTM.

United States District Court,
D. Kansas.

June 13, 2002.

Kirk W. Lowry, Topeka, Independent Living Resource Center, Topeka, KS, for Plaintiff.

Jay C. Hinkel, Michael L. North, City of Wichita, Wichita, KS, for Defendant.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter comes before the court on cross motions for summary judgment in this action brought pursuant to § 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act ("ADA"). The ten individual plaintiffs in this action allege a variety of violations of the ADA by defendant's transit system ("Wichita Transit"). Plaintiffs Tandy, Beltz and Garnett allege ADA violations to the extent that Wichita Transit designates a number of its bus routes as "inaccessible" due to the fact that many of the buses on said routes operate without wheelchair lifts. Tandy, Beltz and Garnett all have mobility impairments requiring the use of wheelchairs. The other plaintiffs bring a variety of service and communication-related complaints. Specifically, the plaintiffs make the following allegations: Donnell—failure to offer a handicap designated seat, failure to call out stops, and failure to have Braille schedules and directories available at the Transit Center; Passman—failure to offer paratransit or alternative transportation when a bus wheelchair lift failed; Farney—failure to deploy a wheelchair lift and failure to pick him up at a bus stop; Goupil—failure to appropriately deploy a wheelchair lift; Goertz—failure to appropriately secure his wheelchair; Jeffries—failure to provide an operational TDD service for hearing disabled individuals. Each plaintiff seeks injunctive relief, $10,000 in compensatory damages and $100,000 in punitive damages, as well as costs and attorney's fees. Both plaintiffs' and defendant's summary judgment motions are fully briefed and ripe for determination. For the reasons set forth below, the court grants defendant's motion in part and denies it in part and grants plaintiffs' motion in part and denies it in part.

## I. Findings of Uncontroverted Fact

During most of 2001, Wichita Transit operated 45 buses on its fixed route system. Of those fixed route buses, approximately 35 are currently handicap accessible. Wichita Transit operates 18 fixed bus routes, 14 of which are designated accessible, meaning that all buses on the given fixed route are ADA compliant with wheelchair lifts. The other four routes are designated inaccessible. Wichita Transit utilizes buses not equipped to handle disabled passengers on these inaccessible routes. One of the 14 accessible fixed routes is covered by vans. In late December 2001, Wichita Transit was to receive delivery of five additional accessible buses, bringing the total number of accessible buses to 40. Wichita Transit utilizes two buses per route on 16 of the 17 fixed routes which utilize buses. The final route is covered by three buses. Thus, at peak operation, a total of 35 buses are servicing the routes. Wichita Transit notes, however, that buses utilized on fixed routes cannot be continuously used to provide transportation. Buses are frequently taken out of service for a variety of reasons. The Federal Transit Administration ("FTA") has concluded that up to 20% of a bus fleet will be out of service at any given time for purposes of determining eligibility for federal grants.

Some of the buses on Wichita Transit's inaccessible routes had operational wheelchair lifts. If a mobility impaired rider sought a ride on such a bus, Wichita Transit drivers were instructed to deploy wheelchair lifts at their discretion if the driver felt that the putative passenger recognized the potential repercussions of accessing a bus on an inaccessible route. Those repercussions comprised the fact that Wichita Transit could not guarantee

that all subsequent connecting buses would be wheelchair accessible. Further, Wichita Transit has the policy and practice of not dispatching paratransit if a subsequent bus was inaccessible or if a rider attempted to board an accessible bus on a inaccessible route and was denied access to that bus.

Wichita Transit's paratransit service serves the entire city of Wichita. It provides "curb-to-curb" service. Wichita Transit has never had a trip denial for its paratransit service, which provides 20,000 trips a month to disabled persons in the area. The entire fixed route bus system, by comparison, deploys its wheelchair lifts on average only two to three times a day. Paratransit fares for pick-up are two times the ordinary bus fare at $2 per ride. To obtain access to the paratransit service, users must place a request for service one day prior to the requested ride. The paratransit service does not have any capacity restraints and does not place any restraints on trip purpose. None of the plaintiffs in this action attempted to access Wichita Transit's paratransit services on the dates set forth in the complaint. Additionally, plaintiffs do not allege that Wichita Transit's paratransit services are not in compliance with ADA regulations.

Wichita Transit has a system of regular maintenance checks and a system to report breakdowns or other mechanical malfunctions on the buses. Buses with wheelchair lift malfunctions are taken out of service as soon as possible and replaced with either an accessible bus from an inaccessible route or from a spare bus with an operable wheelchair lift. Wichita Transit trains and instructs its drivers on ADA issues. Wichita Transit drivers are trained to access wheelchair lifts, secure wheelchairs, call out stops at major intersections and to call for alternative transportation in the event of a mechanical failure of a wheelchair lift. The driver training programs utilize material from the Department of Transportation, and drivers are subject to discipline for failing to comply with their ADA training.

In March 2001, Braille materials were kept at the operations center of the Wichita Transit. At present, the materials are available at the transit center where passengers access the buses. Prior to the relocation of materials, if an individual needed Braille schedules at the transit center, they would be delivered from the operations center within five minutes. Updated Braille materials were ordered on February 6, 2001 as well as audiotapes to assist the visually impaired. Wichita Transit does have an operational TDD system for assisting the hearing impaired. The number is not located on the fixed route bus maps but is available in other materials and on the Wichita Transit web site. Prior to the filing of the present action, Wichita Transit had not received any complaints regarding a rider's inability to access transit services because of problems with the TDD service.

The Topeka Independent Living Resource Center ("TILRC") provides both direct and advocacy services for the disabled community. On March 22, 2001, Mike Oxford, executive director of the TILRC, offered training sessions at the Hyatt Hotel in Wichita, Kansas. Approximately 60 individuals attended the training sessions. Among the attendees were plaintiffs Farney, Passman, Donnell, and Goupil who are each paid staff members of the TILRC. The next day, March 23, plaintiffs attempted to access Wichita Transit's fixed route bus system, all between the times of 9:55 a.m. and 10:45 a.m. Approximately 58 people who had attended the TILRC training sessions the previous evening attempted to access the Wichita Transit bus routes. At approximately 11:00 a.m. to 11:30 a.m. on March 23, the

persons who had attempted to access the fixed route system again met at the Hyatt with representatives of the TILRC and its attorneys. Some individuals were picked up at the bus stops where they had tried unsuccessfully to receive transit service and others were able to take the bus system to their destination. Prior to attempting to obtain rides on the fixed route buses, some of the individuals were given rides to particular bus stops. Specifically, plaintiffs Tandy, Beltz, Passman, Famey, Garnett, and Goupil were denied rides on various fixed route accessible buses on inaccessible routes. Wichita Transit did not call for paratransit or alternative services of any kind. Plaintiffs Tandy, Farney, Passman, Allen and Goertz are residents of Sedgwick County, Kansas. Plaintiffs Donnell, Goupil, Beltz and Jeffries are residents of Shawnee County, Kansas. Plaintiff Garnett is a resident of Montgomery County, Kansas. All of the plaintiffs are qualified individuals with a disability within the meaning of the ADA.

Wichita Transit is a public entity as defined by the ADA. It receives federal funding from the FTA. Since 1990, Wichita Transit has received approximately $50 million for operations, capital expenditures, purchase of buses, maintenance, new buildings, and implementation of the ADA. In 1990, the FTA financed 80% of the purchase price of four new buses for the Wichita Transit. No buses were purchased from 1991 to 1995. On October 1, 1995, Wichita Transit received $1.6 million from the FTA to purchase eight new buses. Another line item grant of $1.585 million was received on October 1, 1996. Wichita Transit received an additional $647,450 on October 1, 1997 for the purchase of 3 new buses and another $88,000 on October 1, 1999 for the purchase of one bus. In 2000, Wichita Transit received an additional $5 million toward the purchase of 39 new accessible buses. Plaintiffs contend that Wichita Transit did not use the grant and line item money to purchase buses. However, Wichita Transit establishes that it purchased eight fixed route buses which were delivered in 1997 with the grant money awarded to the city in 1995. The remainder of the grant money was used to purchase the five new buses delivered in December 2001 and the 34 additional vehicles which were slated for delivery in April 2002. Wichita Transit also notes that grants from the FTA are available for a variety of improvements and are not restricted to the purchase of fixed route buses. While some new buses were purchased with the federal grant money, expenditures were also made to refurbish existing vehicles and to purchase additional paratransit vans. Additionally, vehicles are not required to be purchased immediately after the awarding of federal grants. It is customary in the transit industry to accumulate federal grant funds to purchase buses in larger quantities to take advantage of cost savings and to maximize the uniformity of the bus fleet.

In the early 1980's, Wichita Transit purchased new buses with lifts as a result of new federal regulations. After those regulations were rescinded, Wichita Transit bolted the lifts shut. After passage of the ADA in 1990, Wichita Transit began using FTA grant money to remanufacture the 1980 buses by adding new lifts. From 1991 to 2000, approximately 24 of the 1980 buses were remanufactured. In the same time frame, Wichita Transit has purchased 12 accessible buses. Starting in 1991, Wichita Transit initiated paratransit planning with the FTA. In the 1993 paratransit plan, Wichita Transit represented to the FTA that it hoped to reach full ADA compliance by 1995. In its final paratransit plan completed in October 1997, Wichita Transit claimed that all of its fixed routes would be accessible by 1998. That projection was not met. Defendant indicates that the erroneous projection was caused

by funding vacillations. Due to federal funding cuts in 1995, Wichita Transit determined it would be forced to reduce operations resulting in a fewer number of buses used on fixed routes. This would have allowed the use of exclusively accessible buses by 1998. However, these plans were changed when the Kansas Department of Transportation offered additional funding, which allowed Wichita Transit to maintain the higher level of service, but which also meant that several of the fixed routes would have to remain designated inaccessible.

## II. Summary Judgment Standards

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Analysis and Discussion

### A. Standing

 As a necessary starting point, the court addresses the jurisdictional question of plaintiffs' standing to bring this action. The constitutional requirements for standing are (1) an injury in fact, (2) a causal connection between the injury and the challenged act, and (3) a likelihood that the injury will be redressed by a favorable decision. *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). The alleged injury must be concrete and particularized and imminent or actual, as opposed to conjectural or hypothetical. *Id.* Given the facts and averments prevented by plaintiffs, the court concludes that the non-Sedgwick county plaintiffs (Donnell, Beltz, Garnett, Goupil, and Jeffries) lack standing to pursue this action. Each of these plaintiffs base their individual standing on averments made in response to defendant's motion for summary judgment. *See* Plaintiffs' Response, Tab 4. Each aver to essentially the same intentions, i.e., that they intend to use either the fixed route system or the TDD services several times a year starting in May 2002 to test the systems for accessibility and/or functionality. Each further indicate that such testing is part and parcel of their respective jobs. Despite the above-noted averments, these plaintiffs

have failed to establish an imminent, concrete and particularized injury. To avoid summary judgment, a plaintiff must demonstrate standing "by specific evidentiary facts and not by mere allegations." *Phelps v. Hamilton*, 122 F.3d 1309, 1315–16 (10th Cir.1997). "It is a long-settled principle that standing alone cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *Id.* The Supreme Court has further indicated that stating an "inten[t] to return to the places they had visited before ... is simply not enough. Such 'some day' intentions— without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require [for standing]." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Plaintiffs Donnell, Beltz, Garnett, Goupil, and Jeffries have indicated an intent to return to Wichita and utilize Wichita Transit services several times during the next year to test the system for accessibility. Such intentions are precisely the type of "some day intentions" about which the Supreme Court has expressly rejected standing. These plaintiffs have failed to present any concrete plan as to when these generalized future returns will occur. As such, plaintiffs Donnell, Beltz, Garnett, Goupil, and Jeffries have failed to establish an actual or imminent future injury and are thus dismissed from this action.

■ Plaintiffs Farney and Allen also lack the imminent and particularized injury necessary to confer standing. While they are residents of Wichita, both express only a generalized intent to utilize Wichita Transit services several times a year. Allen states that she intends to "attempt to use it several times a year for personal transportation." Farney intends to utilize the services several times a year for purposes of testing the system. Neither of these plaintiffs present intended use which is any more particularized than the non-Sedgwick County plaintiffs. The court concludes that Farney and Allen lack standing and thus dismisses them from this action.

■ Plaintiffs Tandy, Passman, and Goertz, as residents of Sedgwick County and long-time users of the Wichita Transit system and services do have standing to pursue their claims. Tandy avers to the fact that she uses the bus system regularly and intends to do so in the future. Goertz states his intention to use the bus system for personal use at least twice a month. While Goertz' stated intention is approaching the line of required specificity, the court concludes that the assertion of twice-a-month regular usage is sufficiently concrete to confer standing. Plaintiff Passman states that she would use the transit system to get to her employment on a daily basis if the system were reliable from a handicap accessibility standpoint. An intention to use a system or facility upon ADA compliance is a sufficient allegation to confer standing even if the disabled individual does not intend to utilize the system or facility in its allegedly non-compliant condition. Having found that plaintiffs Tandy, Passman and Goertz have standing to pursue their claims, the court has jurisdiction to reach the merits of those claims.

**B. Compliance with ADA Requirements**

Plaintiffs have alleged a number of violations of Title II of the ADA and § 504 of the Rehabilitation Act of 1973. The relationship between these two statutory schemes in the context of transit transportation is that a recipient of Department of Transportation funds complies with its

§ 504 obligations by complying with ADA requirements. ADA transportation regulations to facilitate compliance with Title II are located at 49 C.F.R. Part 37.

### 1. Wichita Transit's Fixed Route System

Plaintiff Tandy asserts the illegality of Wichita Transit's designation of certain fixed routes as inaccessible. Plaintiffs originally alleged in their complaint that Wichita Transit violated the ADA by purchasing buses after August 25, 1990 that did not have operating wheelchair lifts. Having reviewed the factual findings, the court concludes that this allegation is without any basis in fact as plaintiffs have so stipulated.

■ Plaintiff Tandy's primary allegation is that the ADA requires Wichita Transit's fixed route system to be fully, or 100%, accessible. Title 42 U.S.C. § 12142 identifies certain practices by public transportation providers that are considered discriminatory. In particular, the ADA deems it discriminatory for a public entity operating a fixed-route system to provide disabled individuals with services that are inferior to those provided to the non-disabled. 42 U.S.C. § 12143(a). However, nothing in the ADA regulations leads the court to conclude that the Act mandates 100% fixed route accessibility. In fact, the regulations contemplate the use of paratransit transportation to compliment the availability of the accessible fixed route system. At 49 C.F.R. § 37.121, the pertinent regulations suggest that "each public entity operating a fixed route system **shall provide** paratransit or other special service to individuals with disabilities that is comparable to the level of service provided to individuals without disabilities who use the fixed route system." 49 C.F.R. § 37.121(a) (emphasis added). That section then references §§ 37.123–37.133 for further elaboration on

what constitutes a comparable level of paratransit service. Section 37.121 not only authorizes the use of paratransit services, but mandates the availability of paratransit services for those individuals who are eligible. This, of course, leads to the issue of paratransit availability or eligibility.

Section 37.123(a) indicates that "[p]ublic entities required by § 37.121 of this subpart to provide complementary paratransit service shall provide the service to the ADA paratransit eligible individuals described in paragraph (e) of this section." 49 C.F.R. § 37.123(a). Paragraph (e) of section 37.123 is broken down into three groups of disabled individuals who are eligible for paratransit service. The second group is the most relevant to the issues before the court. Section 37.123(e)(2) lists as paratransit eligible "[a]ny individual with a disability who needs the assistance of a wheelchair lift or other boarding assistance device and is able, with such assistance, to board, ride and disembark from any vehicle which is readily accessible to and usable by individuals with disabilities if the individual wants to travel on a route on the system during the hours of operation of the system at a time, or within a reasonable period of such time, when such a vehicle is not being used to provide designated public transportation on the route." 49 C.F.R. § 37.123(e)(2). This regulation clearly contemplates that transit systems can have routes where accessible vehicles are not being used, i.e., inaccessible routes. Appendix D to Part 37, interpreting the second eligibility group from § 37.123(e)(2) makes the Act's contemplation of inaccessible routes even more clear. Part 37, Appendix D is prefaced by the following statement: "This appendix explains the Department's construction and interpretation of provisions of 49 C.F.R. part 37. It is intended to be used as definitive guidance concerning the

meaning and implementation of these provisions." In discussing category 2 paratransit eligibility pursuant to § 37.123(e)(2), the appendix offers the following guidance:

The second eligibility criterion is the broadest, with respect to persons with mobility impairments, but its impact should be reduced over time **as transit systems become more accessible.** This category applies to persons who could use accessible fixed route transportation, **but accessible transportation is not being used at the time, and on the route, the persons would travel. This concept is route based,** not system based. Speaking first of bus systems, if a person is traveling from point A to Point B on route 1, and route 1 is accessible, the person is not eligible for paratransit for the trip. **This is true even though other portions of the system are still inaccessible.** If the person is traveling from Point A to Point C on route 2, **which is not accessible, the** person is eligible for that trip.... For purposes of this standard, **we view a route as accessible when all buses scheduled on the route are accessible....** We recognize that some systems' operations may not be organized in a way that permits determining whether a given route is accessible, **even though a route-by-route determination appears to be contemplated by the statute.** In such cases, it may be that category 2 eligibility would persist until the entire system was eligible.

Appendix D to Part 37, Construction and Interpretation of Provisions of 49 CFR Part 37 (emphasis added). Thus, according to the Department of Transportation's interpretation of the relevant statutes and regulations, the ADA contemplates that transit systems likely will have inaccessible routes. In such cases, disabled persons are eligible to demand comparable para-transit services. After reviewing the above regulations and interpretations thereof, the court concludes that the ADA allows both fixed route and paratransit systems to work alongside each other to provide transit access for disabled individuals that is, not identical, but "comparable to the level of service provided to individuals without disabilities who use the fixed route system." 49 C.F.R. § 37.121. In short, the ADA does not require 100% fixed route accessibility, but instead requires that the transit system, including paratransit services, provide the disabled with services that are comparable to the services offered to the non-disabled. Comparable services include such things as 1) providing a process for determining paratransit eligibility for both regular users in the community and for visitors from elsewhere; 2) charging no more than twice the regular full fare amount for fixed route transportation; 3) providing paratransit services at the same days and hours or service as the fixed route service; and 4) avoiding any restrictions on trip purpose or limitations based on capacity constraints. The court need not analyze the comparability of Wichita Transit's paratransit services because none of the plaintiffs have made any allegations relating to deficiencies in those services. It is sufficient to conclude that Wichita Transit's designation of certain fixed routes as inaccessible does not violate the ADA so long as Wichita Transit provides alternative services that are comparable in nature. As alluded to in the Department's interpretation of the regulations at Appendix D, Wichita Transit's fixed route system will become more accessible. The ADA clearly requires that any buses purchased for fixed route use, whether new or used, must be fully accessible. As Wichita Transit's fleet ages and replacement buses become necessary, the system will trend toward accessibility. However, nothing in the ADA compels an acceleration of that pro-

cess through the early retirement or refurbishment of inaccessible buses. Inaccessible buses and the resulting inaccessible routes may continue to be used to the extent that the transit system, as a whole, provides comparable alternatives for the disabled community. Defendant is entitled to summary judgment on all of plaintiffs' claims relating to the designation of inaccessible routes.

■ Plaintiffs additionally argue that Wichita Transit violates the ADA by refusing to provide alternative paratransit services for a disabled individual who has been denied access to an inaccessible route. On this issue, plaintiffs' factual basis is flawed. Wichita Transit does not deny paratransit service to persons who desire transit in an inaccessible route area. In fact, Wichita Transit relies on paratransit to provide service to the disabled in those areas. Wichita Transit provides paratransit service for anyone who is disabled anywhere in the city, especially those people who qualify for paratransit under category two (discussed above) due to inaccessibility of a desired fixed route. As is permitted by the ADA at 49 C.F.R. § 37.131, a disabled individual may be required to apply for qualification under the ADA and must meet the prior day notification requirement. The ADA does not require paratransit access for persons who arrive at an inaccessible bus stop and demand immediate paratransit service. By denying such requests from disabled individuals who have failed to follow statutorily permitted paratransit procedure, Wichita Transit does not violate the ADA.

■ Finally, plaintiff Tandy alleges that while testing the Wichita Transit services in March 2001, she was denied access to an accessible bus on an inaccessible route. Wichita Transit admits that its policy is to give its drivers discretion as to whether to allow disabled riders access to an accessible bus on an inaccessible route. If the driver felt that the passenger understood the implications of accessing the bus, then they are to deploy the lift. The court concludes that Wichita Transit's policy is, in fact, in violation of the ADA. Section 37.5(b) states as follows:

> Notwithstanding the provision of any special transportation service to individuals with disabilities, an entity shall not, on the basis of disability, deny to any individual with a disability the opportunity to use the entity's transportation service for the general public, if the individual is capable of using that service.

49 C.F.R. § 37.5(b). The difficulty with Wichita Transit's policy is that the disabled "individual is capable of using" the service of an accessible bus even if it is on an inaccessible route. As such, Wichita Transit, by denying disabled individuals the opportunity to use such accessible buses, is violating the civil rights of the disabled user. Clearly, Wichita Transit has viable concerns about the potential impact of accessing an inaccessible route. However, the final decision to access or to not access the route cannot rest with the driver, but must lie with the disabled individual. In this instance, Wichita Transit must take a common sense approach to compliance with the ADA. As per its current policy, Wichita Transit drivers should continue to inform a disabled rider of the potential ramifications of accessing an inaccessible route, including the fact that no special transportation will be offered to retrieve the disabled rider should they encounter an inaccessible bus on a return trip or additional leg of their journey. Having been so informed, the disabled rider must be allowed to decide whether to access the route or not. Should the disabled rider decide, after being informed of the situation, that he or she wishes to access the bus, the ADA requires that they be allowed to do so. Without belaboring the point, the court concludes that plaintiff

Tandy has shown a likelihood of success on her claim that Wichita Transit's policy of driver discretion in this context violates the ADA. The court further concludes that her claim meets the other requisites for injunctive relief. The court thus enjoins Wichita Transit from engaging in the illegal practice of denying access to an accessible bus on an inaccessible route based on driver discretion. Wichita Transit must inform disabled riders in such situations of the possible consequences of accessing the inaccessible route, and then must provide service on the accessible bus should the rider so request. Finally, whether plaintiff Tandy is entitled to monetary damages for being denied access to an accessible bus remains a triable question.

### 2. Wichita Transit's Lift Maintenance Program

Plaintiff Passman alleges that she was denied access to the transit system due to an inoperable wheelchair lift on an otherwise accessible bus. Plaintiffs seek injunctive relief requiring Wichita Transit to maintain its vehicles so that they will be readily accessible to and usable by individuals with disabilities. They request that wheelchair lifts and other accessibility features be repaired promptly when necessary and that Wichita Transit be required to cycle the lifts at the start of each day and record the results of that testing. At page 26 of their response to defendant's motion for summary judgment, plaintiffs cite a number of documents to establish a number of lift failures throughout the years. For example, plaintiff Goertz provides affidavit testimony that he experienced lift failures 20–30% of the time while he was utilizing bus services 10 times a week between 1994 and 1998. Aside from Goertz' affidavit, plaintiffs' documentation establishes approximately 14 incidents of lift failure since 1996. Wichita Transit responds by arguing that isolated incidents of mechanical lift failure are not violations

of the ADA and that it complies with the ADA by engaging in systematic maintenance checks of the lifts and providing a system for quick reporting and repair of lift failures, accompanied by a system for retrieving stranded, disabled passengers.

 49 C.F.R. § 37.163, titled "Keeping vehicle lifts in operative condition" requires essentially three things of public transit providers: 1) a system of regular and frequent maintenance checks of lifts sufficient to maintain operability; 2) a system to ensure that vehicle operators report lift failures as quickly as possible; and 3) to take the vehicle out of service and repair the lift before that vehicle returns to service. Appendix D to Part 37 is again useful in interpreting these broad guidelines. The appendix discusses lift maintenance requirements in detail:

> Lifts remain rather delicate pieces of machinery, ... It is not surprising that they sometimes break down. The point of a preventive maintenance program is to prevent breakdowns, of course. But it is also important to catch broken lifts as soon as possible, so that they can be repaired promptly... Therefore, the entity must have a system for regular and frequent checks, sufficient to determine if lifts are actually operative. This is not a requirement for the lift daily. If alternate day checks, for example, are sufficient to determine that lifts are actually working, then they are permitted. It would be a violation of this part, however, for the entity to neglect to check lifts regularly and frequently, or to exhibit a pattern of lift breakdowns in service resulting in stranded passengers when the lifts had not been checked before the vehicle failed to provide required accessibility to passengers that day.

Appendix D to Part 37, Construction and Interpretation of Provisions of 49 CFR Part 37. These sections make clear that

isolated lift failures do not constitute an ADA violation. However, a pattern of lift breakdowns can constitute a violation. Plaintiffs have raised a triable issue as to whether the frequency of lift breakdowns within the Wichita Transit system constitutes a pattern of such failures as prohibited by the ADA and accompanying regulations. At this point, plaintiffs have not conclusively established that the rate of mechanical failures within the Wichita Transit system is unusual given the number of buses so as to constitute a pattern of breakdowns as opposed to isolated incidents within a statistical median range. However, they have raised a triable issue on the matter. Regarding Wichita Transit's systematic checks, at page 30 of its motion for summary judgment, Wichita Transit indicates that its current policy is to instruct its drivers to test the lifts at the beginning of each day. Plaintiffs have not controverted that assertion in any way. Nor have plaintiffs alleged any deficiencies in Wichita Transit's overall system of maintenance checks and malfunction reporting procedures. Nonetheless, the number of in-service lift failures noted by plaintiffs could support a finding of a pattern, which precludes summary judgment on this issue. Furthermore, if plaintiff Passman was refused a paratransit alternative after lift-failure on an accessible route, then he may proceed with a claim for damages.

### 3. Wichita Transit's ADA Compliance on Service Issues

 Plaintiff Goertz alleges that when riding on a Wichita Transit bus, the driver refused to secure his wheelchair. Plaintiffs seek injunctive relief requiring Wichita Transit to provide ADA training to its drivers in order to ensure that all instances of such occurrences will be eliminated. It is uncontroverted that Wichita Transit has in place an extensive ADA training program that instructs drivers that they are required to call out stops, utilize the wheelchair lifts, and secure the wheelchairs once on board. Plaintiffs do not allege that the training programs utilized by Wichita Transit are deficient in any way. Nor do plaintiffs deny that Wichita Transit disciplines its drivers for ADA violations. Plaintiffs do not offer any mechanism whereby the court could ensure that every driver complies with his/her ADA training. The court concludes, as a matter of law, that injuries caused by the actions of individual drivers in contravention of his/her extensive ADA training will not likely be redressed by any ruling of this court which is injunctive in nature. Furthermore, given the extensive training program and the penalties attached to ADA violations by Wichita Transit, the court concludes that injunctive relief is an inappropriate means to address what are individual driver, as opposed to systematic, issues. Plaintiff Goertz' claim of monetary damages for the alleged ADA violation perpetrated against him remains. That claim is limited to the single instance wherein Goertz claims that a driver refused to secure his wheelchair to the bus.

Finally, plaintiffs bring various claims relating to Wichita Transit's provision of Braille materials and TDD services. The plaintiffs who are either hearing or visually impaired have been dismissed from this case for lack of standing. The court therefore lacks jurisdiction to consider these issues on the merits.

IT IS THEREFORE ORDERED this _____ day of June, 2002 that defendant's motion for summary judgment (dkt. no. 25) is granted in part and denied in part and plaintiffs' motion for partial summary judgment (dkt. no. 27) is granted in part and denied in part, as set forth below. Specifically, plaintiffs Donnell, Beltz, Garnett, Goupil, Jeffries, Farney, and Allen are dismissed for lack of standing. Defendant's motion is granted as to the follow-

ing: all claims relating to the designation of inaccessible routes; those relating to the failure to provide on-demand paratransit to those who fail to access an inaccessible route; claims for injunctive relief relating to failure of individual drivers to perform ADA required services; and all claims relating to the provision of Braille or TDD services. All other parts of defendant's motion are denied. Plaintiffs' motion is granted to the extent that plaintiffs are entitled to the injunctive relief described above as it relates to defendant's policy of allowing driver discretion in determining which disabled individuals may access an accessible bus on an inaccessible route. Plaintiffs' motion is otherwise denied.