918 A.2d 470

**DEPARTMENT OF HEALTH AND MENTAL HYGIENE**

v.

**Anthony KELLY.**

**No. 47, Sept. Term, 2006.**

Court of Appeals of Maryland.

March 14, 2007.

**400**

Kathleen A. Ellis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, and Tracee Orlove Fruman, Staff Attorney, of Baltimore), on brief for appellant.

Suzanne Sangree (Roscoe Jones, Jr., Public Justice Center, of Baltimore, Laura Cain and Irene Smith of Maryland Disability Law Center of Baltimore), on brief for appellee.

Melvin J. Sykes, Joanne E. Pollak, Vice President and General Counsel Johns Hopkins Medicine, Frederick Savage, Deputy General Counsel, The Johns Hopkins University, Baltimore, brief of the Maryland Psychiatric Society, the Johns Hopkins Health System Corporation, and the Hopkins University, Amici Curiae.

David Rocah, American Civil Liberties Union Foundation of Maryland, Baltimore, John Townsend Rich, Melissa Briggs Hutchens, Goldwin Procter LLP, Washington, DC, brief for the American Civil Liberties Union of Maryland, the Judge David L. Bazelon Center for Mental Health Law, the National Council for Community Behavioral Healthcare, and the National Mental Health Association as Amici Curiae in Support of Appellee.

Argued before BELL, C.J., RAKER, WILNER *, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

The case *sub judice* presents this Court with the task of determining whether Section 10–708(g) of the Health–General Article of the Maryland Code (1982, 2005 Repl.Vol.) [1] requires

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Section 10–708 provides in pertinent part:

 (b) *Medication authorized.*—Medication may not be administered to an individual who refuses the medication, except:

the State to prove that an individual, because of his mental illness, is dangerous to himself or others within a state institution before it may forcibly administer medication. Because we hold that Section 10–708(g) does so require, we shall affirm the judgment of the Circuit Court for Baltimore City.

## I. Introduction

Between 2002 and 2003, Anthony Kelly was charged in four indictments with two counts of murder, both capital offenses, two counts of first-degree rape, one count of first-degree burglary, one count of second-degree burglary, two counts of robbery with a dangerous and deadly weapon, one count of first-degree assault, three counts of theft over five hundred dollars, one count of theft under five hundred dollars, three counts of the use of a handgun in a crime of violence, and one

-----

(1) In an emergency, on the order of a physician where the individual presents a danger to the life or safety of the individual or others; or
(2) In a nonemergency, when the individual is hospitalized involuntarily or committed for treatment by order of a court and the medication is approved by a panel under the provisions of this section.

\* \* \*

(g) *Approval of medication by panel.*—The panel may approve the administration of medication or medications and may recommend and approve alternative medications if the panel determines that:
(1) The medication is prescribed by a psychiatrist for the purpose of treating the individual's mental disorder;
(2) The administration of medication represents a reasonable exercise of professional judgment; and
(3) Without the medication, the individual is at substantial risk of continued hospitalization because of:
(i) Remaining seriously mentally ill with no significant relief of the mental illness symptoms that cause the individual to be a danger to the individual or to others;
(ii) Remaining seriously mentally ill for a significantly longer period of time with mental illness symptoms that cause the individual to be a danger to the individual or to others; or
(iii) Relapsing into a condition in which the individual is in danger of serious physical harm resulting from the individual's inability to provide for the individual's essential human needs of health or safety.
Maryland Code (1982, 2005 Repl.Vol.), Section 10–708 of the Health–General Article.
All references to the Maryland Code are to the 2005 Replacement Volume of the Health–General Article unless otherwise noted.

count of transporting a handgun by vehicle. Kelly was represented by the Office of the Public Defender with respect to three of the indictments, but represented himself with respect to the charges in the fourth indictment.

During a pre-trial hearing on July 18, 2003, Kelly moved to discharge his attorneys, contending that he would rather represent himself because he had lost confidence in them. As a result of this motion, Judge Durke G. Thompson of the Circuit Court for Montgomery County held a competency hearing on September 16, 2003 and referred Kelly to the Clifton T. Perkins Hospital, a maximum security psychiatric hospital operated by the Maryland Department of Health and Mental Hygiene, for evaluation.

Kelly was evaluated by Dr. Rosemary Carr–Malone, a Forensic Psychiatry Fellow at Perkins Hospital, and Dr. Lisa Hovermale, a liaison with developmentally disabled patients at Springfield State Hospital. The competency evaluation, which was memorialized in a Pretrial Psychiatric Evaluation Report, was completed on February 5, 2004, and concluded that Kelly had a mental disorder that influenced his thinking and his behavior and that he was not competent to stand trial. The report found that although Kelly was competent enough to understand the nature of the proceedings against him, *i.e.*, the charges against him, the possible penalties he faced, the roles of the judge, jury, witnesses, and attorneys, and the potential plea options, he did not understand the adversarial nature of those proceedings and could not assist in his defense:

Kelly was not malingering symptoms of a mental illness. In fact, he denied having a mental illness, or having any symptoms or behaviors suggesting that he had a mental illness. Kelly wanted to be found competent to stand trial, and he believed that he was competent. Despite Kelly's statements to the contrary, Kelly did not understand the adversarial object of the court system, and was unable to assist with his defense, as evidenced by Kelly's evaluations at [Perkins Hospital], his writings, and his behavior. Kelly's thinking and behavior were profoundly influenced by his persecutory and grandiose delusional beliefs to the point of

interfering with his ability to understand the adversarial object of the proceedings, and to assist with his defense by planning a legal strategy and making reasoned choices. Therefore, to a reasonable degree of medical certainty, Kelly understood the nature of the proceedings against him. However, he was unable to understand the object of the proceedings against him, or assist in his defense, due to delusional symptoms derivative of a mental disorder.

The report also concluded that Kelly was "considered dangerous," because he "had a history of assaultive and violent behavior," and "was charged with serious crimes."

Judge Thompson determined that Kelly was not competent to stand trial on June 3, 2004, and subsequently issued a Memorandum Opinion Upon Competency of the Defendant which determined that Kelly's thinking on critical issues surrounding his case merited the "inescapable" conclusion that he was delusional, and that although his intentions to assist his case were meritorious, his actions had been "counter-productive to his own representation." With respect to Kelly's release on bail, the court presumed that he was dangerous to himself or others:

This Court may consider the release of the defendant on a bail bond if the defendant is deemed to be not dangerous as a result of a mental disorder or retardation to himself, to others, or to the property of others. Given the gravity of the charges pending against the defendant, it is fair to say that, if proven, the charged actions of the defendant represent a risk to the public of the most dangerous degree. Consequently, the Court grants defendant's counsel leave to request a hearing, if they so desire, to determine the degree of dangerousness the defendant's release would represent to the public. If there is no request for further hearing, then this Court will treat the issue of dangerousness as having been established.

In the event the defendant is not released on bail due to his dangerousness, this Court may order the defendant committed to the facility that the Health Department designates until this Court is satisfied that the defendant no longer is

incompetent to stand trial, or is no longer a danger to self, others, or the property of others by reason of his mental condition. MD.CODE ANN., CRIM. PROC. § 3–106(b)(1) (2004). Neither Kelly nor his counsel requested a hearing regarding his dangerousness or any release on bail. Because the record does not include any other order for commitment, we have assumed that Judge Thompson did not make an explicit finding regarding the issue of dangerousness and committed Kelly to Perkins Hospital pursuant to Section 3–106 of the Criminal Procedure Article, Maryland Code (2001).[2]

During his confinement at Perkins Hospital, Kelly denied he had a mental disorder, and except for a six-month period from May 2004 until November 2004, did not take the antipsychotic medications prescribed for him. On August 18, 2005, the Department of Health and Mental Hygiene notified Kelly that a Clinical Review Panel would be reviewing his eligibility for forced psychiatric medication pursuant to Section 10–708(b)(2) of the Health–General Article. On August 23, 2005, the Clinical Review Panel convened and approved the forced administration of medication for treatment of Kelly's delusional disorder:

> Without the medication, you are at substantial risk of continued hospitalization because of ... [r]emaining seriously mentally ill with no significant relief of the mental illness

---

**2.** Section 3–106 of the Criminal Procedure Article provides:

(a) *Release.*—Except in a capital case, if, after a hearing, the court finds that the defendant is incompetent to stand trial but is not dangerous, as a result of a mental disorder ... to self or the person or property of others, the court may set bail for the defendant or authorize release of the defendant on recognizance.

(b) *Commitment.*—(1) If, after a hearing, the court finds that the defendant is incompetent to stand trial and, because of ... a mental disorder, is a danger to self or the person or property of another, the court may order the defendant committed to the facility that the Health Department designates until the court is satisfied that the defendant no longer is incompetent to stand trial or no longer is, because of ... a mental disorder, a danger to self or the person or property of others.

Maryland Code (2001), Section 3–106 of the Criminal Procedure Article.

symptoms that cause you to be a danger to yourself or to others ... or ... [r]emaining seriously mentally ill for a significantly longer period of time with mental illness symptoms that cause you to be a danger to yourself or to others.

Kelly appealed the Clinical Review Panel's decision to the Office of Administrative Hearings, and during the hearing before the ALJ, testimony was taken from Dr. Wisner–Carlson, Kelly's treating physician at Perkins Hospital, on behalf of the Department, who addressed Kelly's delusional disorder that formed the basis for the incompetency evaluation and for the decision to forcibly administer psychotropic drugs:

DR. WISNER–CARLSON: He suffers from delusional disorder, persecutory and grandiose type.

[COUNSEL FOR DEPARTMENT]: And can you describe exactly what that means?

DR. WISNER–CARLSON: Sure. Delusional disorder is a psychotic disorder.... A psychotic disorder is an illness where the person, in lay terms, is out of touch with reality in some way. And the—and in delusional disorder, the main aspect of delusional disorder is that the person has a delusion. A delusion is a fixed, false, idiosyncratic belief. So they have some fixed belief about the world or about, you know, something going on with them.

For delusional disorder, the delusion is different than other psychotic disorders, such as schizophrenia, in that the delusion is non-bizarre. And what that means is that the thing that the person believes generally could happen. So that when one is evaluating a person to make—in considering the diagnosis of delusional disorder, one has to check a lot of collateral information to determine whether this is a normal belief or whether this is a pathological belief that falls in this realm of delusion.

\* \* \*

[COUNSEL FOR DEPARTMENT]: Could you give us some specifics regarding Mr. Kelly's delusion that he has?

DR. WISNER–CARLSON: Sure. He's under treatment now, and so some of the delusions have faded, we think. But—and he doesn't seem to hold them to the same degree. But in making the diagnosis, the delusions that he had, he believed that he could represent himself in the cases against him, which were serious cases, and according to his attorney, were charges that wouldn't be dropped and that could result in the death penalty for him. And he wished to represent himself and put himself forward to the case as a pro se litigant, saying that he felt that there is a conspiracy; that his lawyer was part of the conspiracy; that she had lied to him on a number of occasions; and that she had lied to him in particular about a so-called secret search warrant; that she had gotten it inappropriately from the State's Attorney; that she had supposedly told him about a plea bargain that would cap the sentence for all the charges to six years; and he had in different ways represented a distrust of her and the judge, which appeared delusional.

He wrote to the Judge. He wrote to her supervisor. He wrote to the legal oversight board—I can't recall the name of it—complaining about her. And in different of these letters, made statements that he felt that she was involved in a conspiracy against him; that she was—

[COUNSEL FOR DEPARTMENT]: When you say she and her, are you talking about the judge or the lawyer?

DR. WISNER–CARLSON: The lawyer, I'm sorry. His lawyer.

[COUNSEL FOR DEPARTMENT]: Okay.

DR. WISNER–CARLSON: Mary Siegfried. And I'm sorry, she's his lawyer, the judge is a man and the prosecutor is a man.

[COUNSEL FOR DEPARTMENT]: Thank you.

DR. WISNER–CARLSON: If that helps.

[COUNSEL FOR DEPARTMENT]: Yes.

DR. WISNER CARLSON: And that she was engaged with the State's Attorney in trying to get him found guilty and

getting him prosecuted and fabricating evidence and the like.

\* \* \*

And that is—there is many examples of that, but that's basically the gist of the persecutory delusions that he had. He also has—or has had grandiose delusions, and those delusions refer to his—well, he felt that he could represent himself adequately at the trial. . . . And he has felt very competent in his ability to represent himself in this extremely serious matter, even though it has been explained to him that not every lawyer in the public defender's office would be given the opportunity to represent him in such a case, that it's a special legal team that does it.

And he bases that on these legal courses and on his kind of history, which goes back a number of years of what he calls a jailhouse lawyer, in making motions to the court and giving advice to other inmates and this sort of thing.

And the degree to which he has previously held those beliefs, although this part seems a little better, is—was felt by a number of psychiatrists and the court to raise to the degree of being a delusion.

\* \* \*

So he—and so he doesn't have the cognitive abilities—or he doesn't have the schooling. He also doesn't have the cognitive abilities. He was borderline intelligence on testing, but also on special neuro-psychologic testing he has a cognitive disorder, special problems in reading, and so he—so it's not felt that he has a cognitive ability to pursue—to be the CEO of a company and to be a successful businessman in that way. And plus he doesn't have the vocational history.

But he continued—he has continued to uphold those ideas to a delusional degree. And interestingly enough, with treatment, he's released a lot of those ideas.

[COUNSEL FOR DEPARTMENT]: Does Mr. Kelly have any ideas or delusions regarding evidence against him in the criminal trial?

DR. WISNER–CARLSON: He has in the past felt that it was both fabricated and inadequate. Per Dr. Carr–Malone's pre-trial report, which reviews the State's evidence, there is supposedly DNA evidence. He feels that is false or inadequate. There is other evidence that he—some eyewitness for one of the crimes, for the rape. There is other evidence, physical evidence, that—to a layperson that is not a lawyer seems fairly substantial, and it does to me, to the other psychiatrists. And he has felt that all of that evidence would be thrown out of court.

Indeed, he has recently met with his attorney, recently being in the beginning of June, and he has indicated to her at that time that it would [not be beneficial] to represent himself in the case, and he shared with me in a letter that she has written to him—Mary Siegfried has written to him, and in that letter she strongly urges him to have legal counsel. She said that the case won't be dropped and that the charge is very serious and that it could result in the death penalty.

[COUNSEL FOR DEPARTMENT]: And has Mr. Kelly made any statements regarding whether he believed that he would be successful in representing himself in this criminal case?

DR. WISNER–CARLSON: Previously he's felt very comfortable in representing himself, and thought that he could represent himself. He felt especially that he could represent himself because the charges would be dropped. More recently, as of yesterday when I had spoken to him about it, he seems more willing to accept that the charges won't be dropped and that the case could well go forward and that he would rather have an attorney represent him, but that if the court won't appoint a different attorney, then he feels comfortable representing himself.

* * *

[Kelly] is argumentative, litigious, like I said, peevish; will often file numerous complaints, lawsuits, grievances, this sort of thing, and will do so when there doesn't seem to be merit; when—will continually re-file the complaint even though when its reviewed by the court or whatever, the reviewing agency, it will be thrown out or felt, again, to not have merit.

* * *

[H]e has repeatedly made complaints about his public defender, about the State's Attorney. He's—about the judge, to the different review agencies, to their supervisors. He was—when he first came in the hospital and up to maybe three or four months ago, was repeatedly filing lawsuits to Howard County Circuit Court about various complaints he had about staff or the hospital, and all of these were discharged, not having merit.

In response to a question concerning whether Kelly was a danger to himself or to others, Dr. Wisner–Carlson opined that Kelly was a danger to others because "he's been adjudicated as a dangerous person by a judge." On cross-examination, Dr. Wisner–Carlson could not point to any specific instances of dangerous behavior within the context of Kelly's confinement, testifying that Kelly has "not threatened or assaulted anyone while he's been in [Perkins Hospital]. He's not been in seclusion or restraints. He's not been on any special observation. And he's not had any special intervention in regards to assaultiveness or the like."

Kelly testified before the ALJ, iterating that he did not have a mental illness, did not suffer from delusions, was not dangerous, had a perfect patient record at Perkins Hospital, and was competent to stand trial. He emphasized that he had taken medication, which was not beneficial and caused detrimental side effects:

[COUNSEL FOR KELLY]: Do you believe that you're competent, that you're able to stand trial at this time for the charges against you?

KELLY: One hundred percent, I'm competent to stand trial.

\* \* \*

[COUNSEL FOR KELLY]: Do you believe that you have a mental illness?

KELLY: I don't have any mental illness. I don't suffer from delusions.

\* \* \*

[COUNSEL FOR KELLY]: And are you in agreement with taking the medication at this particular time that has been prescribed by Dr. Wisner–Carlson?

KELLY: No, I don't like the medicine. . . .

[COUNSEL FOR KELLY]: Have you ever experienced any side effects from the medication?

KELLY: Yes. And I told Dr. Carlson about it. One time I had the shakes, and I went to the nurse's station and told them at midnight that I had the shakes. I couldn't stop shaking and I had difficulty breathing. And she called the doctor—called some other doctor—and told me to take. . . . That's when the shakes went away. But I was sweating like I don't know what, like running water, and the room was cold, also.

\* \* \*

[COUNSEL FOR KELLY]: Do you believe that the medications have helped you in any way?

KELLY: Not really.

[COUNSEL FOR KELLY]: Do you believe that the medications have harmed you in any way?

KELLY: Yes.

[COUNSEL FOR KELLY]: And how do you believe that they have harmed you?

KELLY: Because the side effects can do damage to your liver and your sugar, your blood, and all sorts of—it just messes everything up.

The ALJ concluded that Kelly suffered from a delusional disorder and that the medications were prescribed for the purpose of treatment:

> The evidence in this case is that the alleged delusions circle around Mr. Kelly's belief that his attorney was working against him, that the judge was working against him, that his attorney, Ms. Siegried, had violated a number of provisions that she should not have violated, such as privileged communication, allegedly some reference to a secret warrant, that Ms. Siegfried had passed on documents or received documents from the prosecutor, and had passed on documents to Dr. Wisner–Carlson.
>
> * * *
>
> I find that Dr. Wisner–Carlson's diagnosis of delusional disorder is, in fact, a reasonable, supportable diagnosis. Next, I have to determine whether the medication prescribed by Dr. Wisner–Carlson has been proscribed for the purpose of treating delusional disorder. Dr. Wisner–Carlson has credibly testified that the medical authorities support treatment of delusional disorder through medication. He has also testified that other psychiatrists in this hospital believe that it is—delusional disorder is treatable through these medications.
>
> Therefore, I find that his testimony, that the medication was prescribed for the purpose of treating a mental disorder, to be supported by the evidence. The evidence is also undisputed that Mr. Kelly has refused the psychiatric medications that are listed in the Clinical Review Panel's decision. . . . I find that the administration of medication represents exercise of professional judgment.

Mr. Kelly was provided with a discussion of the potential side effects. He has been monitored for the exhibition of those side effects. Although Mr. Kelly testified that he did have one night when he was feeling unwell, I do have testimony indicating that those feelings or those conditions were related to the medication. Moreover, Mr. Kelly was able to take two Tylenol, and those health conditions vanished.

Clearly then, I do not believe that the side effects are so severe as to make it an unreasonable exercise of professional judgment to administer these medications to Mr. Kelly. Moreover, Dr. Wisner–Carlson has testified that some of Mr. Kelly's symptoms appear to be dissolving after treatment of this medication, further supporting my conclusion that the administration of medication represents a reasonable exercise of professional judgment.

With respect to the last requirement of Section 10–708(g)—whether without the medication, Kelly was at substantial risk of continued hospitalization because of remaining seriously mentally ill with no significant relief of the mental illness symptoms that cause him to be a danger to the individual or others—the ALJ found that the circuit court judge had determined Kelly to be a danger to himself or others and that determination was sufficient to permit forcible medication:

The issue that has been raised is whether the hospital has established all the necessary criteria, specifically dangerousness. The hospital has presented testimony that Mr. Kelly was adjudicated to be a dangerous person as a result of a 38–page decision by a Circuit Court Judge. That decision is not recent, thus the question becomes whether the hospital is found to establish whether Mr. Kelly is dangerous as of this time.

The statute regarding involuntary commitment requires evidence of current dangerous. The statute regarding refusal of forced medication has been under court review. The Court of Special Appeals several years ago issued a determination—issued a decision saying that dangerousness

had to be current dangerousness for 10–708, as well as to be a voluntary admission as part of the statute.

That decision by the Court of Special Appeals was vacated. Therefore, I cannot rely upon it as any legal authority to determine that in Maryland this statute requires evidence of current dangerousness.

\* \* \*

There is no Maryland case law interpreting Section 10–708 with regard to the term of current dangerousness. And I find that in the absence of such case law, that it is reasonable, it is a reasonable interpretation for me to rely on the previous dangerousness determination by the Circuit Court, which was clearly a lengthy, detailed decision made after a lot of evidence was presented to the Court.

Based on my findings, I conclude as a matter of law that the hospital has shown by a preponderance of the evidence that M r. Anthony Kelly should be medicated with the psychiatric medication listed above for a period not to exceed 90 days.

Kelly sought judicial review of the ALJ's findings of fact and conclusions of law in the Circuit Court for Baltimore City, and also moved for a stay of forced medication pending a hearing, which was denied. At the hearing on the merits, Kelly's counsel argued that the record before the ALJ was insufficient to support a finding of current dangerousness, which she contended was a predicate for forced medication under Section 10–708(g). The Department of Health and Mental Hygiene, conversely, relied upon the opinion of the Circuit Court for Montgomery County, contending that the finding that Kelly was dangerous at the time he was committed was sufficient to forcibly medicate. After hearing arguments from counsel and reviewing the transcript of the administrative hearing, Judge Albert J. Matricciani, Jr., of the Circuit Court for Baltimore City, reversed the decision of the ALJ based upon the Court of Special Appeals's decision in *Martin v. Department of Health and Mental Hygiene*, 114

Md.App. 520, 691 A.2d 252, *vacated as moot,* 348 Md. 243, 703 A.2d 166 (1997), which held that for purposes of forcible administration of medication, Section 10–708(g) of the Health–General Article requires evidence that an involuntarily committed individual is a danger to himself or others in the context of his confinement within the facility in which he has been committed, rather than to society upon release.[3]

---

**3.** The Order of the Circuit Court for Baltimore City provided:

This matter having come before the Court as an on the record appeal from the decision of the Administrative Law Judge dated September 1, 2005, the Court having heard the arguments of counsel and reviewed the transcript of the proceeding before the Administrative Law Judge, it is this *9th day of November, 2005,* by the Circuit Court for Baltimore City, Part 20, **ORDERED** that the decision of the Administrative Law Judge dated September 1, 2005 is **REVERSED** for the reasons stated below.

This appeal turns on the interpretation of Md.Code Ann., Health General Art., § 10–708 (2005 Repl.Vol. & 2005 Suppl.) which sets forth the bases under Maryland law by which an individual involuntarily committed to a state psychiatric facility may be involuntarily medicated. In the present case the ALJ approved the determination of a clinical review panel that Anthony Kelly, a patient at the Patuxent Institution, could be forcibly medicated, while being held in a status of incompetent to stand trial on serious criminal charges. Kelly's appellate counsel argued that the record before the ALJ was insufficient to support a finding of current dangerousness, which she contended is a necessary predicate for approval of forced mediation under Maryland's statutory scheme. The Department of Health & Mental Hygiene relied upon the record evidence, which contained a finding by a Montgomery County Circuit Court Judge on the issue of dangerousness, at the time that Kelly was committed as incompetent to stand trial, prior to his institutionalization at Patuxent.

This Court is persuaded on the issue presented by the analysis of the panel of the Court of Special Appeals of Maryland in the case of *Martin v. Dept. of Health & Mental Hygiene,* 114 Md.App. 520, 691 A.2d 252 (1997), interpreting § 10–708 to require evidence that an involuntarily committed individual is a danger to himself or others in the facility to which he has been involuntarily admitted, rather than to society generally upon his release. This court is persuaded that that is a correct interpretation of Maryland's involuntary medication statute. Although the judgment of the Court of Special Appeals in *Martin* was vacated and ultimately dismissed on the ground of mootness, following a per curiam order of the Court of Appeals, 348 Md. 243, 703 A.2d 166 (1997), its reasoning may constitute persuasive authority to this Court in the same sense as other dicta may constitute persuasive authority on any legal issue. *West v. State,* 369 Md. 150, 157, 797 A.2d 1278 (2002).

The Department of Health and Mental Hygiene appealed Judge Matricciani's Order to the Court of the Special Appeals, and subsequently this Court issued, on its own initiative, a writ of certiorari prior to any proceedings in the intermediate appellate court. *Dep't of Health v. Kelly*, 393 Md. 477, 903 A.2d 416 (2006). The Department's brief presents the following issue:

> Did the circuit court err in construing Section 10–708 of the Health–General Article to require the Department to show that an involuntary patient is a danger to himself or to others in the facility before the patient may be forcibly medicated when, without medication, the patient will remain hospitalized indefinitely?

We hold that Section 10–708(g) requires the State to prove that an individual involuntarily committed to a state institution is, because of his mental illness, dangerous to himself or others in the context of his confinement within the institution before it may forcibly administer medication.

---

In *Martin,* 114 Md.App. at 520, 691 A.2d at 252, the Court of Special Appeals held that Section 10–708(g)(3)(i) permits forcible medication only if the individual, without medication, is a danger to himself or others in the facility in which he is confined. After considering the fact that Section 10–708 was enacted in the present tense, and not the future tense, which would have required the State to prove the individual would be a danger to the general community if released, the intermediate appellate court considered the dangerousness requirement in conjunction with the other statutory provisions involving involuntary admitted individuals. *Id.* at 527–28, 691 A.2d at 256. The court noted that because to admit an individual involuntarily under Section 10–632, the civil commitment statute, there must be a showing of dangerousness in the community, and that to require the same showing to subsequently forcibly medicate would render the dangerousness requirement in the forcible medication statute "redundant," and could not have been the legislature's intent. *Id.* at 528, 691 A.2d at 256. Judge Wenner, writing for the court, further stated that the Legislature's intent must have been to allow forcible administration of medication "only when all else fails," given that forced medication constitutes such a substantial interference with a person's liberty. *Id.* Judge Wenner also noted that the rationale behind Section 10–708(g)(3)'s enactment must have been to provide individuals with additional procedural due process grounds, and that to adopt an interpretation allowing forcible medication when the individual would be a danger if released, would "nullify" the statute's purpose. *Id.* at 529, 691 A.2d at 256.

## II. Discussion

The Department contends that to forcibly medicate Kelly under Section 10–708(g), the State is only required to prove that he is at substantial risk of continued hospitalization because he remains seriously mentally ill and that he poses a danger to himself or others in the community if released, which they argue was proven during the commitment hearing in 2004. The Department also contends that to adopt Kelly's reasoning that an involuntarily committed individual must be dangerous in the context of confinement in order to involuntary medicate would render the Clinical Review Panel provisions of Section 10–708(g) meaningless surplusage in light of the interplay of Sections 10–701(c)(3)(i)[4] and 10–708(b)(1)[5] of the Health–General Article, which permits forcible administration of medication in an emergency. According to the Department, Kelly's interpretation would eviscerate Section 10–708 because an individual who is at substantial risk of continued hospitalization could refuse medication for treatment, absent a finding of current dangerousness, even though his involuntary commitment was dependent upon a prior finding of dangerousness.

Kelly, conversely, argues that the legislative history supports his interpretation of Section 10–708(g) that to forcibly medicate an involuntarily committed individual, the State is required to prove that the individual is a substantial risk of continued hospitalization because he exhibits symptoms of a mental illness that cause him to be a danger to himself or others in the context of his confinement within the state institution. Kelly also maintains that a dangerousness finding made during a prior commitment proceeding is not equivalent

---

**4.** Section 10–701(c)(3)(i) provides that a patient is entitled to be free from restraints or "locked door seclusions" unless in an emergency where the patient "presents a danger to the life or safety of the individual or of others."

**5.** Section 10–708(b)(1) states that medication may be forcibly administered "[i]n an emergency, on the order of a physician where the individual presents a danger to the life or safety of the individual or others."

to the dangerousness finding needed to thereafter forcibly medicate under Section 10–708(g). Moreover, Kelly argues that the Department's interpretation would implicate various constitutional rights, including the right to freedom of speech.[6]

Ordinarily, a physician cannot properly undertake any therapy, in nonemergency situations, without an individual's informed consent. *Sard v. Hardy*, 281 Md. 432, 438–39, 379 A.2d 1014, 1019 (1977). The individual's right to refuse medical treatment includes the administration of medication. *Williams v. Wilzack*, 319 Md. 485, 494–95, 573 A.2d 809, 813 (1990). These rights embody an individual's liberty interest in bodily integrity. *Id.*

Section 10–708 (b)(2) of the Health–General Article provides an exception to the general rule, permitting the State to overrule an individual's right to refuse medical treatment by permitting the forcible administration of medication in "a nonemergency, when the individual is hospitalized involuntarily or committed for treatment by order of a court and the medication is approved by a panel under the provisions of this section." The methodology for the Clinical Review Panel to determine the efficacy of forcible administration of medication is provided by Section 10–708(g), which requires that it determine the medication is prescribed by a psychiatrist to treat the individual's mental disorder, that the medication represents a reasonable exercise of professional judgment, and that without the medication, the individual is a substantial risk of continued hospitalization because the patient,

> (i) Remain[s] seriously mentally ill with no significant relief of the mental illness symptoms that cause the individual to be a danger to the individual or to others;

---

**6.** Because we decide this case on a non-constitutional ground, we will not decide the constitutional issues posed. *See Piscatelli v. Bd. of Liquor License Comm'rs*, 378 Md. 623, 629–30, 837 A.2d 931, 935 n. 2 (2003) (stating that, in Maryland, it is a well established principle "that a court will not decide a constitutional issue when a case can properly be disposed of on a non-constitutional ground").

(ii) Remain[s] seriously mentally ill for a significantly longer period of time with mental illness symptoms that cause the individual to be a danger to the individual or to others; or (iii) Relaps[es] into a condition in which the individual is in danger of serious physical harm resulting from the individual's inability to provide for the individual's essential human needs of health or safety.

Three different categories of involuntarily committed individuals may be forcibly medicated under Section 10–708(g): individuals involuntarily committed to a state institution civilly under Section 10–632(e) of the Health–General Article; individuals involuntarily committed after having been found not criminally responsible under Section 3–112 of the Criminal Procedure Article, Maryland Code (2001); and individuals involuntarily committed after being found incompetent to stand trial under Section 3–106(b) of the Criminal Procedure Article, Maryland Code (2001), such as the Respondent herein.

The critical issue presented to us is whether in order to forcibly medicate under Section 10–708(g), the State is required to show that, because of a mental illness, an individual involuntarily committed to a state institution is dangerous to himself or others in the context of his confinement within the state institution, or only that the individual was, or would be if released, dangerous to himself or others in the general community.

 The general principles of statutory interpretation are well established, as our goal is to identify and effectuate the legislative intent underlying the statute. *Oakland v. Mountain Lake Park*, 392 Md. 301, 316, 896 A.2d 1036, 1045 (2006); *In re Anthony R.*, 362 Md. 51, 57, 763 A.2d 136, 139 (2000). To ascertain the Legislature's intent, we first examine the plain language of the statute; if the language is unambiguous when construed according to its ordinary meaning, then we will "give effect to the statute as it is written." *Oakland*, 392 Md. at 316, 896 A.2d at 1045; *Pak v. Hoang*, 378 Md. 315, 323, 835 A.2d 1185, 1189 (2003), quoting *Moore v. Miley*, 372 Md. 663, 677, 814 A.2d 557, 566 (2003). If a statute's language has more than one reasonable interpretation, however, the

language is ambiguous, and we will resolve any ambiguity in light of the legislative history, caselaw, and statutory purpose. *Oakland,* 392 Md. at 316, 896 A.2d at 1045; *Comptroller v. Phillips,* 384 Md. 583, 591, 865 A.2d 590, 594 (2005). We will examine the ordinary meaning of the language, as well as "how that language relates to the overall meaning, setting, and purpose of the act," resolved to avoid any unreasonable, illogical, or inconsistent interpretation of the statute. *Oakland,* 392 Md. at 316, 896 A.2d at 1045; *Gwin v. MVA,* 385 Md. 440, 462, 869 A.2d 822, 834–35 (2005). Finally, we presume that the Legislature has acted with full knowledge of prior legislation, and construe the statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory. *Oakland,* 392 Md. at 316, 896 A.2d at 1045; *Mazor v. State Dep't of Correction,* 279 Md. 355, 360–61, 369 A.2d 82, 86–87 (1977).

The General Assembly did not define the temporal context for the determination of dangerousness in Section 10–708(g), i.e., whether it is past dangerousness, dangerousness in the context of confinement in a state institution, or future dangerousness that is the salient trigger for forcible medication to treat a mental illness. Because Section 10–708(g) is subject to multiple interpretations, it is, therefore, ambiguous, and we look to legislative history to illuminate the Legislature's intent. *Oakland,* 392 Md. at 316, 896 A.2d at 1045.

House Bill 1372,[7] the first legislative attempt to address the issue of forcible medication, entitled "Mentally Ill Individuals—Refusal of Medication," initially provided "that a mentally

---

7. House Bill 1372 provided:

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That Section(s) 10–708 through 10–712, respectively, of Article—Health—General of the Annotated Code of Maryland be renumbered to Section(s) 10–709 through 10–713, respectively.
SECTION 2. AND BE IT ENACTED, That the Laws of Maryland read as follows:
Article—Health—General
10–708.

ill individual in a Mental Hygiene facility may refuse medication for the treatment of a mental disorder except in emergency situations when the physician orders the medication because of danger to the life or safety to the individual or others, or if the individual is hospitalized involuntarily or by

(A) AN INDIVIDUAL IN A FACILITY MAY ELECT TO REFUSE MEDICATION USED FOR THE TREATMENT OF A MENTAL DISORDER EXCEPT:

(1) WHEN THE MEDICATION IS PROVIDED ON THE ORDER OF A PHYSICIAN IN AN EMERGENCY WHERE THE INDIVIDUAL PRESENTS A DANGER TO THE LIFE OR SAFETY OF THE INDIVIDUAL OR OTHERS; OR

(2) IN NONEMERGENCY SITUATIONS, WHERE THE INDIVIDUAL IS HOSPITALIZED INVOLUNTARILY OR BY ORDER OF A COURT AND THE MEDICATION IS APPROVED BY A CLINICAL REVIEW PANEL.

(B) (1) THE CLINICAL REVIEW PANEL CONSISTS OF THE FOLLOWING MEMBERS APPOINTED BY THE MEDICAL DIRECTOR:

(I) THE MEDICAL DIRECTOR IF THE MEDICAL DIRECTOR IS A PHYSICIAN OR A PHYSICIAN DESIGNATED BY THE MEDICAL DIRECTOR;

(II) A PSYCHIATRIST; AND

(III) A NONPHYSICIAN MENTAL HEALTH CARE PROVIDER.

(2) ONLY 1 MEMBER OF THE CLINICAL REVIEW PANEL MAY BE DIRECTLY RESPONSIBLE FOR IMPLEMENTING THE INDIVIDUALIZED TREATMENT PLAN FOR THE INDIVIDUAL UNDER REVIEW.

(C)(1) IN DETERMINING WHETHER TO APPROVE THE MEDICATION, THE CLINICAL REVIEW PANEL SHALL:

(I) REVIEW THE INDIVIDUAL'S CLINICAL RECORD;

(II) CONSULT WITH THE FACILITY PERSONNEL WHO ARE RESPONSIBLE FOR IMPLEMENTING THE INDIVIDUAL'S TREATMENT PLAN;

(III) CONSULT WITH THE INDIVIDUAL REGARDING THE REASONS FOR REFUSING THE MEDICATION;

(IV) REVIEW THE INDIVIDUAL'S CAPACITY TO MAKE DECISIONS CONCERNING TREATMENT; AND

(V) REVIEW THE POTENTIAL CONSEQUENCES OF REQUIRING THE INDIVIDUAL TO ACCEPT THE MEDICATION AND OF WITHHOLDING THE MEDICATION FROM THE INDIVIDUAL.

(2) THE CLINICAL REVIEW PANEL MAY NOT APPROVE THE MEDICATION WHERE THERE ARE ALTERNATIVE TREATMENTS THAT ARE ACCEPTABLE TO BOTH THE INDIVIDUAL AND FACILITY PERSONNEL WHO ARE DIRECTLY RESPONSIBLE FOR IMPLEMENTING THE INDIVIDUAL'S TREATMENT PLAN.

SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall take effect July 1, 1984.

House Bill 1372 (1984).

order of a court and the medication is approved by a clinical review panel." Department of Fiscal Services, Fiscal Note to House Bill 1372 (1984). It also established certain criteria for the clinical review panel to follow for implementing a treatment plan for certain individuals under review and for the approval and use of medication for certain patients. *Id.* The Bill was described by Delegate Paula C. Hollinger as reflecting the "balance between a patient's right to determine what is ingested into his or her body, . . . and a professional's duty to provide the best available treatment," and by Eugene Kowalczuk, Chief Attorney for The Legal Aid Bureau, as "protect[ing] the interest of the individual while addressing the concerns of the facility personnel." Written Testimony of Delegate Paula C. Hollinger on House Bill 1372 Before the House Environmental Matters Committee, on March 13, 1984; Letter from Eugene Kowalczuk, Chief Attorney, The Legal Aid Bureau, to Honorable Larry Young, Chairman, House Environmental Matters Committee (March 7, 1984). House Bill 1372, as modified, was enacted, took effect on July 1, 1984, and was codified as Section 10–708[8] of the Health General Article, providing in pertinent part:

(a) *Election to refuse medication; exceptions.*—An individual in a facility may elect to refuse medication used for the treatment of a mental disorder except:

\* \* \*

(2) In nonemergency situations, where the individual is hospitalized involuntarily or by order of a court and the medication is approved by a clinical review panel.

\* \* \*

(c) *Approval of medication by panel.*—(1) In determining whether to approve the medication, the clinical review panel shall:

---

**8.** Prior to 1984, Section 10–708 of the Health–General Article was entitled "Director's access," and did not involve forced medication. The section was moved to Section 10–712 of the Health–General Article pursuant to House Bill 1372. 1984 Md. Laws, Chap. 480.

(i) Review the individual's clinical record;

(ii) Consult with facility personnel who are responsible for implementing the individual's treatment plan;

(iii) Consult with the individual regarding the reasons for refusing the medication;

(iv) Review the individual's capacity to make decisions concerning treatment; and

(v) Review the potential consequences of requiring the individual to accept the medication and of withholding the medication from the individual.

(2) The clinical review panel may not approve the medication where there are alternative treatments that are acceptable to both the individual and facility personnel who are directly responsible for implementing the individual's treatment plan.

1984 Md. Laws, Chap. 480, codified as Maryland Code (1982, 1989 Supp.), Section 10–708(c) of the Health–General Article.[9]

Section 10–708 remained unchanged until 1991, after House Bill 588 had been introduced, when the General Assembly extensively modified it as a result of our opinion in *Williams*, 319 Md. at 485, 573 A.2d at 809, to provide additional procedural and substantive due process [10] safeguards for individuals receiving forcible medication:

---

**9.** Before the enactment of House Bill 1372, in November of 1982, "the Mental Hygiene Administration, DHMH, issued 'Interim Guidelines for the use of Psychotropic Medication in State Mental Health Facilities' to provide physicians in State facilities with legally acceptable standards to follow when a patient objects to treatment." Letter from Fran Tracey, Director, Office of Legislative, Volunteer and Public Relations, to Honorable Dennis F. Rasmussen, Chairman, Senate Finance Committee (April 6, 1984). House Bill 1372 provided "the same general protection for the patient" afforded under the Interim Guidelines. *Id.*

**10.** Procedural due process safeguards have been described as requiring "both notice and an opportunity to be heard on the issues to be decided in a case," *Blue Cross of Md., Inc. v. Franklin Square Hosp.*, 277 Md. 93, 101, 352 A.2d 798, 804 (1976), while substantive due process rights require legislation to be fair, and not "arbitrary, oppressive or unreasonable." *Hargrove v. Bd. of Trustees of Md. Retirement System*, 310 Md. 406, 427, 529 A.2d 1372, 1382 (1987). The Supreme Court, in

In 1990, the Court of Appeals, in *Williams v. Wilzack,* 319 Md. 485, 573 A.2d 809 (1990), found that the clinical review panel process failed to provide adequate procedural and substantive due process protection for the involuntary administration of drugs to a mental patient in a psychiatric institution operated by the Department of Health and Mental Hygiene.

Without this process, health officials must obtain a court order of guardianship before medicating a dangerous individual who refuses medication. Guardianship, however, involves a finding of incompetence, which may not be present in all cases involving refusal of medication.

The courts have found that involuntarily committed patients are entitled to some, if limited, due process. The bill provides both procedural and substantive protection in accordance with case law.

Senate Judicial Proceedings Committee, Bill Analysis of House Bill 588 (1991). Initially, when House Bill 588 was introduced, it provided in relevant part, that the State could forcibly medicate an individual only if,

WITHOUT THE MEDICATION, THE INDIVIDUAL IS AT SUBSTANTIAL RISK OF CONTINUED HOSPITALIZATION BECAUSE OF:

A. REMAINING SERIOUSLY MENTALLY ILL WITH NO SIGNIFICANT RELIEF OF THE MENTAL ILLNESS;

B. REMAINING SERIOUSLY MENTALLY ILL FOR A SIGNIFICANTLY LONGER PERIOD OF TIME; OR

---

*Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), discussed substantive and procedural due process in the framework of a forcible medication case:

Restated in the terms of this case, the substantive issue is what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will; the procedural issue is whether the State's nonjudicial mechanisms used to determine the facts in a particular case are sufficient.

*Id.* at 220, 110 S.Ct. at 1036, 108 L.Ed.2d at 197.

C. RELAPSING INTO A CONDITION IN WHICH THE INDIVIDUAL IS IN DANGER OF SERIOUS PHYSICAL HARM RESULTING FROM THE INDIVIDUAL'S INABILITY TO PROVIDE FOR THE INDIVIDUAL'S ESSENTIAL HUMAN NEED OF HEALTH OR SAFETY.

House Bill 588 (1991) (Introduced and read: February 1, 1991). Subsequent to its introduction, amendments were proposed by the Maryland Psychiatric Society, and On Our Own of Maryland, Inc., a statewide organization representing people who had been in psychiatric hospitals, which was critical of the language of the initial bill as "much too broad," further complaining that "some patients by their diagnosis of a chronic mental illness alone, e.g., chronic depressive illness; will meet this standard." Written Testimony In Support of House Bill 588 with Amendments, On Our Own of Maryland.[11] The Maryland Psychiatric Society proposed the amendment which provided the basis for the language of Section 10–708(g), permitting the forcible administration of medication only if, without the medication, the individual is at substantial risk of continued hospitalization because of:

———

**11.** On Our Own of Maryland's proposed amendment to House Bill 588 provided that forced medication would be available if, without the medication, the individual were to be at substantial risk of continued hospitalization because of,

A. REMAINING SERIOUSLY MENTALLY ILL WITH NO SIGNIFICANT RELIEF OF THE MENTAL ILLNESS OR REMAINING SERIOUSLY MENTALLY ILL FOR A SIGNIFICANT LONGER PERIOD OF TIME; AND

B. THE INDIVIDUAL IS COMMUNICATING IRRATIONALLY OR IS IN DANGER OF SERIOUS PHYSICAL HARM RESULTING FROM THE INDIVIDUAL'S INABILITY TO PROVIDE FOR THE INDIVIDUAL'S ESSENTIAL HUMAN NEEDS OF HEALTH OR SAFETY; OR

C. RELAPSING INTO A CONDITION IN WHICH THE INDIVIDUAL IN DANGER OF SERIOUS PHYSICAL HARM RESULTING FROM THE INDIVIDUAL'S INABILITY TO PROVIDE FOR THE INDIVIDUAL'S ESSENTIAL HUMAN NEED OF HEALTH OR SAFETY.

Written Testimony In Support of House Bill 588 with Amendments, On Our Own of Maryland.

A. REMAINING SERIOUSLY MENTALLY ILL WITH NO SIGNIFICANT RELIEF OF THE MENTAL ILLNESS SYMPTOMS WHICH CAUSE THE INDIVIDUAL TO BE A DANGER TO SELF OR OTHERS; [OR]

B. REMAINING SERIOUSLY MENTALLY ILL FOR A SIGNIFICANTLY LONGER PERIOD OF TIME WITH MENTAL ILLNESS SYMPTOMS WHICH CAUSE THE INDIVIDUAL TO BE A DANGER TO SELF OR OTHERS.

Letter from Maryland Psychiatric Society, to John S. Arnick, Chairman, House Judiciary Committee (March 8, 1991). The Senate Judicial Proceedings Committee's Bill Analysis of House Bill 588 described the bill's extensive modifications to provide procedural and substantive due process protections for involuntarily committed individuals:

The procedural safeguards include: advance notice to the individual that a clinical review panel will be convened, including the right to attend, present evidence, ask questions, and be assisted by a lay advisor; appeal to the Office of Administrative Hearings if the panel approves the administration of medication.

*The substantive provisions require the panel to make specific findings that without the medication, the person will require a longer period of hospitalization and will continue to be a danger to self and others.*

Senate Judicial Proceedings Committee, Bill Analysis of House Bill 588 (1991) (emphasis added).

The Clinical Review Panel provisions enacted in 1991 were set to terminate June 30, 1993, but were extended in 1993, pursuant to House Bill 170, to July 1, 1995. 1993 Md. Laws, Chap. 135. The Floor Report of the Senate Judicial Proceedings Committee referred to the holding in *Williams v. Wilzack,* 319 Md. at 485, 573 A.2d at 809, and repeated that the basis for the extensive change in 1991 was:

Current law regarding forced medication was enacted in 1991 after *Williams v. Wilzack,* 319 Md. 485, 573 A.2d 809 (1990), pointed out inadequate due process protections in

the way clinical review panel carried out the forced administration of antipsychotic medication to involuntarily committed mental patients. In response to *Williams,* procedural due process protections in the clinical review process now include: (1) advance notice to the individual that a clinical review panel will be convened and that the individual will be allowed to attend, present evidence, ask questions, and receive the assistance of a lay advisor; and (2) the right of an appeal to the Office of Administrative Hearings, if the panel approves the administration of medication.

Substantive due process protections now require the panel to make specific findings that without medication, the individual will require a longer period of hospitalization and will continue to be a danger to himself and others.

Senate Judicial Proceedings Committee, Floor Report on House Bill 170 (1993). The Legislature also, again, rejected any requirement that the State also must prove that the individual is incompetent to make medical decisions before forcibly administering medication, stating that obtaining a court order of guardianship after a finding of incompetence was an option to avoid the Clinical Review Panel process, but could not be required because incompetence "is not present in every case that involves a refusal of medication." [12] *Id.*

In *Williams v. Wilzack,* the noted linchpin of the 1991 revision, we held that Section 10–708, as in effect in 1988, was facially unconstitutional because it "did not afford the requisite procedural due process protections" for the forcible administration of medication to an involuntarily committed individual, and explored Supreme Court precedent, including *Harper,* 494 U.S. at 210, 110 S.Ct. at 1028, 108 L.Ed.2d at 178, *Mills v. Rogers,*[13] 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982),

---

**12.** The General Assembly extended the termination date for Section 10–708(g) in 1995, 1999, 2001, and 2005, when, finally, the sunset provision was repealed. *See* 1995 Md. Laws, Chap. 266; 1999 Md. Laws, Chap. 203; 2001 Md. Laws, Chap. 15; 2005 Md. Laws, Chap. 13.

**13.** In *Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), the Supreme Court recognized that substantive due process

and *Youngberg v. Romeo*,[14] 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), and concluded that an individual must be provided with advance notice of any proceedings before a clinical review panel, the right to be present, to present evidence, to cross-examine witnesses at the hearing, as well as to have the assistance of an advisor who understands the psychiatric issues involved. *Williams*, 319 Md. at 509, 573 A.2d at 821. Although the holding in *Williams* rested on procedural due process grounds, Chief Judge Robert Murphy, writing for the Court, considered the substantive due process implications of Section 10–708 in light of the Supreme Court's decision in *Harper*, 494 U.S. at 210, 110 S.Ct. at 1028, 108 L.Ed.2d at 178:

> rights could be subject to broader protection under state law than under federal law:
>
>> As a practical matter both the substantive and procedural issues are intertwined with questions of state law. In theory a court might be able to define the scope of a patient's federally protected liberty interest without reference to state law. Having done so, it then might proceed to adjudicate the procedural protection required by the Due Process Clause for the federal interest alone. For purposes of determining actual rights and obligations, however, questions of state law cannot be avoided. Within our federal system the substantive rights provided by the Federal Constitution define only a minimum. State law may recognize liberty interests more extensive than those independently protected by the Federal Constitution. If so, the broader state protections would define the actual substantive rights possessed by a person living within that State.
>
> *Id.* at 299–300, 102 S.Ct. at 2448–49, 73 L.Ed.2d at 22–23 (citations omitted).

**14.** In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court held that an individual involuntarily committed to a state institution possesses a liberty interest protected by the Due Process Clause of the Fourteenth Amendment to experience safe conditions of confinement, to be free from unreasonable bodily restraints, and to pursue "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Id.* at 320–22, 102 S.Ct. at 2460–61, 73 L.Ed.2d at 40–41. The Court stated, however, that these rights are not absolute, but may be limited "to the extent professional judgment deems this necessary to assure ... safety" for all residents and personnel within the institution. *Id.* at 324, 102 S.Ct. at 2462, 73 L.Ed.2d at 42.

Section 10–708, like the administrative policy approved in *Harper*, implicitly recognizes that the involuntarily committed inmate has a significant constitutional liberty interest to be free from the *arbitrary* administration of antipsychotic drugs. In this regard, the cited provisions of the Health–General Article evidence the intention of the legislature to create a justifiable exception that the drugs will not be administered to an inmate *unless he is mentally ill and a danger to himself or others.* In other words, the Maryland statute limits the authority of the panel to order that such drugs be involuntarily given to Williams for any purpose other than for his mental disorder and only to treat the illness which renders him a danger to himself or others. *Williams*, 319 Md. at 508, 573 A.2d at 820 (second emphasis added).

In *Harper*, the case upon which *Williams* relied, the Supreme Court considered whether a judicial hearing was required before the State could forcibly administer antipsychotic drugs to a prisoner with a serious mental disorder. The Court upheld a Washington state administrative policy, which provided that an inmate in a state institution could only be involuntarily medicated if he were afforded a hearing for which he was provided notice thereof, and at which was entitled to present evidence, cross-examine witnesses, to be represented by a lay advisor, and from which he was entitled to appeal an adverse decision. *Harper*, 494 U.S. at 215–16, 236, 110 S.Ct. at 1033–34, 1044, 108 L.Ed.2d at 193–94. Because of the procedural protections in the Washington policy, the Court did not require a judicial hearing prior to forcible administration of medication, commenting that given the medical nature of the decision to forcibly medicate, an inmate's interests are "perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge." *Id.* at 231, 110 S.Ct. at 1042, 108 L.Ed.2d at 204.

In explaining these procedural due process safeguards, Justice Kennedy, writing on behalf of the Court, explored the factual circumstances that must exist before the State may administer antipsychotic drugs, the substantive due process

framework, noting that the "extent of a prisoner's right ... to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement." *Id.* at 222, 110 S.Ct. at 1037, 108 L.Ed.2d at 198. Justice Kennedy emphasized the balance that must be struck between the medical interests of the prisoner and the needs of the State:

> Moreover, the fact that the medication must first be prescribed by a psychiatrist, and then approved by a reviewing psychiatrist, ensures that the treatment in question will be ordered only if it is in the prisoner's medical interests, given the legitimate needs of his institutional confinement.

\* \* \*

> There are few cases in which the State's interest in combating the danger posed by a person to both himself and others is greater than in a prison environment, which, "by definition," is made up of persons with a "demonstrated proclivity for antisocial criminal, and often violent, conduct." ... We confront here the State's obligations, not just its interests. The State has undertaken the obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution. Prison administrators have not only an interest in ensuring the safety of prison staffs and administrative personnel, ... but also the duty to take reasonable measures for the prisoners' own safety.

\* \* \*

> Where an inmate's mental disability is the root cause of the threat he poses to the inmate population, the State's interest in decreasing the danger to others necessarily encompasses an interest in providing him with medical treatment for his illness.

*Id.* at 222, 225–26, 110 S.Ct. at 1037–39, 108 L.Ed.2d at 198–201 (citations omitted).

Primarily, the General Assembly rejected the possibility that forcible administration of medication could be permitted solely based upon involuntary commitment and the possibility of continued confinement by refusing to adopt the original language of House Bill 588 permitting the forcible administration of medication if the individual was at substantial risk of remaining seriously mentally ill for a significantly longer period of time or with no significant relief of the mental illness. Rather, the Legislature enacted a version of House Bill 588 consistent with the Maryland Psychiatric Society's proposed amendment, incorporating a dangerousness standard within Section 10–708(g), obviously to limit the breadth of the original bill which would have permitted forcible medication of involuntarily committed individuals based upon their diagnoses.

When the Legislature enacted Section 10–708(g), it also purposefully adopted the procedural due process requirements and substantive due process safeguards iterated in *Williams* and its foundational precursor, *Harper.* In this regard, the *Harper* opinion must be viewed in the context of its review of a Washington state policy that permitted forcible medication of psychotic drugs on a mentally ill inmate based solely upon the impact that his disorder had on prison security: "In order for involuntary medication to be approved, it must be demonstrated that the inmate suffers from a mental disorder and as a result of that disorder constitutes a likelihood of serious harm to himself or others and/or is gravely disabled." *Id.* at 243–44, 110 S.Ct. at 1048, 108 L.Ed.2d at 212 (Blackmun, J., concurring), quoting Lodging, Book 9, Policy 600.30, p. 1. In fact, the Washington policy under review in *Harper* is suggestive of the language of Section 10–708(g):

[I]f a psychiatrist determines that an inmate should be treated with antipsychotic drugs but the inmate does not consent, the inmate may be subjected to involuntary treatment with the drugs only if he (1) suffers from a "mental disorder" and (2) is "gravely disabled" or poses a "likelihood of serious harm" to himself, others, or their property.

* * *

■ "Gravely disabled" means "a condition in which a person, as a result of a mental disorder: (a) [i]s in danger of serious physical harm resulting from a failure to provide for his essential human needs of health or safety, or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." "Likelihood of serious harm" means "either: (a) [a] substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on one's self, (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm, or (c) a substantial risk that physical harm will be inflicted by an individual upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others."

*Harper,* 494 U.S. at 215 & n. 3, 110 S.Ct. at 1033 & n. 3, 108 L.Ed.2d at 193–94 & n. 3 (citations omitted).[15] Obviously, the

---

**15.** Immediately after the decision in *Harper,* the Supreme Court denied certiorari in *United States v. Charters,* 863 F.2d 302 (4th Cir.1988), a case in which it had granted a stay of judgment pending its review of the certiorari petition in that case. *See Charters v. United States,* 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). In *Charters,* the Government sought to forcibly medicate an involuntarily committed individual who had been declared incompetent to stand trial for a federal crime, who without medication, would likely remain confined in an institution indefinitely. After deciding that a judicial hearing was not necessary prior to the forced administration of medication, the United States Court of Appeals for the Fourth Circuit remanded the case to the district court in order "to require that before medication is administered the appropriate medical professional reevaluate the situation in light of present conditions and make a new decision before proceeding." *Charters,* 863 F.2d at 311–12.

Various federal courts of appeals have interpreted the decision in *Harper* to require proof, before forcibly medicating an involuntarily committed individual because of his dangerousness, that the individual

danger alluded to in the Washington policy was that which is current, or manifest in the institution. It is within this context of legislative history and caselaw that we explore the question before us and conclude that the dangerousness requirement of Section 10–708(g) refers to the institutional setting, rather than prior or future dangerousness. Clearly, the addition of the dangerousness requirement in Section 10–708(g) in 1991 was a limitation of the overly broad language of

---

is dangerous within the context of his confinement within the institution. In *United States v. Weston*, 255 F.3d 873 (D.C.Cir.2001), Weston had been placed in solitary confinement under constant observation—characterized as "the warehousing of Weston in a psychotic state"—in a Federal Correctional Institute awaiting trial on two counts of murder, one count of attempted murder, and three counts of using a firearm in a crime of violence. The United States Court of Appeals for the District of Columbia examined the application of *Harper's* holding, and found that the record was insufficient to support forcible administration for that purpose because Weston's current confinement—"total seclusion and constant observation—obviated any significant danger he might pose to himself or others" at the institution. *Id.* at 878.

In *Jurasek v. Utah State Hospital*, 158 F.3d 506 (10th Cir.1998), the court interpreted a state hospital policy permitting forced medication if a hearing committee determines that "the patient is, or will be, gravely disabled and in need of medication treatment or continued medication treatment," or, "without the medication treatment or continued medication treatment, the patient poses of will pose, a likelihood of serious harm to himself/herself, others, or their property." *Id.* at 509. The court noted that the dangerousness finding needed to forcibly medicate must be the individual's immediate dangerousness within his current confinement. *Id.* at 512 (stating that any finding of dangerousness made at a commitment hearing is of "dubious relevance" to the dangerousness determination needed to forcibly medicate unless such a determination is made "close in time to the hospital's decision to medicate").

In *Morgan v. Rabun*, 128 F.3d 694 (8th Cir.1997), the Court of Appeals for the Eighth Circuit explored the limited role of the court in questioning whether a doctor who prescribed medication, exercised professional judgment in determining dangerousness. The Missouri statute at issue in the case stated that no patient may be subject to forced medication "unless it is determined by the head of the facility or the attending licensed physician to be necessary to protect the patient, resident, client, or others." *Id.* at 697, quoting Mo.Rev.Stat. § 630.175.1 (1986). When considering the doctor's dangerousness assessment, the court stated that given the nature of the crimes he was accused of, his unstable and hostile demeanor, the fact that he had destroyed hospital property, and his own admissions that he was "going

the original bill, which would have permitted the Department to do what it asks us to sanction here. The addition, however, of the procedural due process provisions and substantive due process standards in Section 10–708(g) as a result of *Williams* and *Harper* does not support the Department's interpretation.

Further, to adopt the Department's reasoning would provide an anomalous result when the forcible administration of medications to involuntarily committed individuals in acute emergency situations, governed by Section 10–708(b)(1), is considered. Under Section 10–708(b)(1), an individual may be administered medication on an involuntary basis in an emergency "where the individual presents a danger to the life or safety of the individual or others." It would be incongruous indeed to permit the State to continually forcibly medicate an individual under Section 10–708(g) in a nonemergency with no finding of dangerousness within the context of the state institution, while permitting the *intermittent* forcible medication for an acute emergency episode within the institution under Section 10–708(b)(1). Under the Department's reasoning, there would be no need for the emergency administration of drugs, because any involuntarily committed patient could be continuously medicated in order to, solely, avoid continued hospitalization.

The Department's interpretation of Section 10–708 also would render the dangerousness finding required by the Clinical Review Panel redundant. Section 10–708(b)(2) permits the State to forcibly medicate individuals involuntarily committed to a state institution; individuals may be involuntarily committed to a state institution if they are dangerous to themselves or others in the general community. If Section 10–708(g) requires a showing only that the individual is dangerous to himself or others in the general community, it, then, would mandate a finding which was already made during a commitment proceeding, such as in the present case, which to make matters more complicated, was made based upon a presump-

---

crazy and losing control," Morgan was potentially dangerous to himself and others in the state hospital. *Id.* at 697–98.

tion premised upon the charges filed against Kelly. As the Court of Special Appeals stated in *Martin,* such an interpretation of Section 10–708(g) "would obviate the intent of the General Assembly," by allowing "the General Assembly's scheme for the protection of such individuals [to be] easily avoided." 114 Md.App. at 529, 691 A.2d at 257.

The Department contends that not permitting the State to forcibly medicate solely for release will lead to illogical results because many individuals could be confined indefinitely in a state institution without medication. That may be a possibility. It certainly was considered by the Legislature in 1991 when it enacted Section 10–708(g), because one of the assumptions explicated by the Department of Legislative Services in its fiscal impact note for the proposed amendments to House Bill 588 was that:

> Some individuals who are involuntarily admitted for an acute mental illness and who may be *competent* to make treatment decisions (and, therefore, *are not appropriate for guardianship)* may refuse medication and remain in the facility, untreated with medication, for an extended period of time.

Department of Fiscal Services, Fiscal Note—Assumptions to House Bill 588 (1991) (emphasis in original).[16]

---

**16.** The issue of lengthy confinement in a mental institution, absent medication, was explored by the Supreme Court in *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), when Justice Breyer, writing for the Court, remarked:

> The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill—and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime. We do not mean to suggest that civil commitment is a substitute for a criminal trial. The Government has a substantial interest in timely prosecutions. And it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost. The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution.

*Id.* at 180, 123 S.Ct. at 2184, 156 L.Ed.2d at 212. *See also Cochran v. Dysart,* 965 F.2d 649, 651 (8th Cir.1992) (stating that the government's interest in treating an involuntarily committed individual to improve his

In the present case, Kelly was committed involuntarily to a state institution as a result of having been adjudged incompetent to stand trial, after having been presumed to be dangerous based upon the charges filed against him. The Clinical Review Panel, who recommended forcibly administering medication to Kelly, as well as the ALJ who approved the recommendation, premised their decisions upon the Circuit Court's presumption of dangerousness, in juxtaposition to the testimony that Kelly was not exhibiting behavior that was dangerous to himself and others in the institution. In this they were wrong. Section 10–708(g) defines the governmental interests that may justify the forcible administration of medication to an involuntarily committed individual—an individual must be at substantial risk of continued hospitalization because of either remaining seriously mentally ill with no significant relief of the mental illness symptoms, or remaining seriously mentally ill for a significantly longer period of time with mental illness symptoms, that cause the individual to be a danger to himself or to others in the context of the institution. Because there was no finding that Kelly is a danger to himself or others during his confinement in Perkins Hospital, a prerequisite to forcible administration of medication pursuant to Section 10–708(g), we shall affirm the judgment of the Circuit Court for Baltimore City.

*JUDGMENT OF THE CIRCUIT COURT OF BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.*

WILNER, J., files a concurring opinion joined by HARRELL, J.

Concurring Opinion by WILNER, J., which HARRELL, J., joins.

I concur in the Court's judgment because, on this record, I think it is right. My concern is that the question articulated

condition and obtain his release did not justify forcible administration of medication).

by the Department is not the one actually presented in the case, and I fear that the answer that the Court proposes to give to that question may produce a result that is inappropriate, inconsistent with the legislative intent, and wholly illogical.

In a nutshell, the Court proposes to hold that, whenever the psychiatrists in a State hospital to which a criminal defendant has been committed by a court pursuant to § 3–106 of the Criminal Procedure Article (CP) believe it necessary to forcibly medicate the person, the focus must always be on whether, without the medication, the person will be dangerous to self or others within the institutional setting. In the Court's view, whether, without the medication, the person will have to remain hospitalized for a significantly longer period than would otherwise be necessary because he or she will continue to be a danger to self or others upon release to the community is, as a matter of law, irrelevant. In my view, that is much too broad a statement. It is one not in keeping with § 10–708(g)(3) of the Health–General Article (HG) and creates an absurd "Catch–22" anomaly that cannot possibly have been intended by the General Assembly and that is not Constitutionally required.

It is important at the outset to focus only on what is before us—a criminal defendant committed by a court pursuant to CP § 3–106. We are not dealing here with a patient committed through civil proceedings, whose ultimate release is governed by HG § § 10–801 through 10–813 (other than § 10–803, which deals with voluntary admissions). Although some of the analysis may be the same in both situations, there are differences in both the statutory language and the procedures for obtaining release from the confinement. A criminal defendant committed pursuant to CP § 3–106 may not be released by the hospital, but only by the court, and, unlike the civilly committed patient, he or she is not entitled to a jury trial on the issues pertinent to release. Thus, with respect to the criminal defendant, there is a clear and direct connection between the criteria set forth in HG § 10–708(g)(3), governing forcible medication and CP § 3–106, governing release from

hospital confinement that needs to be considered. My analysis in this concurring opinion is in the context of the criminal defendant

I think that, in determining whether the focus in that setting should be on dangerousness within the institutional setting or dangerousness within the broader community, the courts must look at the nature and purpose of the prescribed medication. If the purpose of the medication, alone or in combination with other medications or therapies, is simply behavior control—to calm the patient and keep him or her calm and compliant—I agree that the focus must be limited to dangerousness within the institutional setting. If, on the other hand, the State can demonstrate that the purpose of the medication, alone or in combination with other medications or therapies, is not just to suppress but to treat and ameliorate the symptoms that caused the patient to be committed under CP § 3–106 in the first place, the focus must necessarily be on whether (1) without the medication, those symptoms will not be treated or ameliorated and the patient will therefore remain ineligible for release under CP § 3–106, and (2) with the medication, the patient will likely become eligible for release. The burden is on the State to show both that the prescribed medication is for that broader purpose and that, alone or in conjunction with other medications or therapies, it has a reasonable chance of achieving that objective without undue side effects. I concur with the Court's judgment in this case because I do not believe that showing was made here.

As somewhat of a belated preface, it is important to note that the case before us is moot, a matter overlooked by the Court. As we most recently held in *In re Kaela C.*, 394 Md. 432, 452, 906 A.2d 915, 927 (2006), "a case is moot when there is no longer any existing controversy between the parties at the time that the case is before the court, or when the court can no longer fashion an effective remedy." *See also Hammen v. Baltimore Police*, 373 Md. 440, 449, 818 A.2d 1125, 1131 (2003) and cases cited there. This case involves our review of an order issued by an Administrative Law Judge on September 1, 2005, approving the forcible medication of Kelly.

By its own terms, however, that order was effective for only 90 days; it expired after the 90th day, and, so far as this record reveals, neither it nor any renewal of it remains in effect. Currently, therefore, there is no order in effect for us to review. When the challenged order has expired, the case is moot. *Coburn v. Coburn,* 342 Md. 244, 250, 674 A.2d 951, 954 (1996).

Although our routine response when a case becomes moot is to dismiss the appeal without addressing the merits, which is what we did in *Dept. of Health v. Martin,* 348 Md. 243, 703 A.2d 166 (1997), we have, on rare occasions, exercised our discretion to consider the merits of such an appeal "where the urgency of establishing a rule of future conduct in matters of important public concern is imperative and manifest." *Matthews v. Park & Planning,* 368 Md. 71, 96, 792 A.2d 288, 303 (2002), quoting from *Lloyd v. Supervisors of Elections,* 206 Md. 36, 43, 111 A.2d 379, 382 (1954). *See also Hammen v. Baltimore Police, supra,* 373 Md. at 450, 818 A.2d at 1131. Such an urgency exists "if the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between government and its citizens." *Id.*

This is such a case, so the Court is therefore right to consider the matter. Decisions involving the forcible medication of criminal defendants committed to State hospitals pursuant to CP § 3–106 are matters of important public concern and involve a relationship between the government and its citizens. The questions raised in this case are likely to recur and will nearly always be moot before an appeal can be perfected and resolved. Kelly remains hospitalized and is continuing to refuse medication. Any order for forcible medication may not last more than 90 days, although it may be renewed if the patient continues to refuse the medication. *See* HG § 10–708(m).

As the Court points out, Kelly was charged in the Circuit Court for Montgomery County with two counts each of first

degree murder, rape, burglary, and robbery with a deadly weapon, one count of first degree assault, and assorted lesser charges. It appears that the murder charges qualified Kelly for the death penalty. Observing his behavior at a pretrial hearing, the court was concerned as to whether he was competent to stand trial. Accordingly, it held a competency hearing and referred Kelly to Clifton T. Perkins Hospital, a State maximum security psychiatric hospital, for evaluation. The evaluation report concluded that Kelly was not competent to stand trial because, as the result of delusional symptoms derivative of a mental disorder, he was unable to understand the object of the proceedings against him or assist in his defense. The report also found that Kelly was dangerous because he had a history of assaultive and violent behavior and was charged with serious crimes.

In June, 2004, after conducting a hearing, the court agreed that Kelly was not competent to stand trial and that, because he was dangerous to himself or the person or property of others *in the community,* he could not be released. In that regard, the court observed that "[g]iven the gravity of the charges pending against the defendant, it is fair to say that, if proven, the charged actions of the defendant represent a risk *to the public* of the most dangerous degree." (Emphasis added.) Kelly was therefore committed to Perkins pursuant to CP § 3–106(b).

The commitment, under the statute, is to remain "until the court is satisfied that the defendant no longer is incompetent to stand trial or no longer is, because of . . . a mental disorder, a danger to self or the person or property of others." CP § 3–106(b)(1). It is implicit in that statutory requirement that Kelly will remain committed until such time as the court is satisfied that he is no longer incompetent to stand trial or no longer a danger to himself or others *in the community.* In any release decision based on lack of dangerousness, the court's focus will clearly be—indeed, *must* be—on dangerousness in the community, not dangerousness in the institutional setting. That proposition is not contested by Kelly and seems to be acknowledged by the Court. Because, despite his belief

that he is not mentally ill, Kelly has never sought to convince the court that he is no longer a danger to himself or to the person or property of others for purposes of CP § 3–106(b), and because the court has not come to any such conclusion on its own, its finding of dangerousness in the community, made in June, 2004, remains extant.

As the Court notes, notwithstanding the findings of the psychiatric evaluation and the judicial determination to the contrary, which he has never challenged in court, Kelly continued to maintain that he does not have a mental disorder and is not delusional, and, in November, 2004, he refused to continue taking the antipsychotic medications that had been prescribed for him and that he had been taking since June. The hospital then convened a clinical review panel pursuant to HG § 10–708(c) to examine whether those medications should be administered over his objection.

Section 10–708(b) states the general rule that medication may not be administered to an individual who refuses the medication, except "(1) [i]n an emergency, on the order of a physician where the individual presents a danger to the life or safety of the individual or others; or (2) [i]n a nonemergency, when the individual is hospitalized involuntarily or committed for treatment by order of a court and the medication is approved by a panel under the provisions of this section." Section 10–708(g) sets forth the criteria, or requirements, for approval of forced medication by the panel in the non-emergency situation. That is what is at issue in this case. The section provides, in relevant part:

"The panel may approve the administration of medication or medications and may recommend and approve alternative medications if the panel determines that:

(1) The medication is prescribed by a psychiatrist for the purpose of treating the individual's mental disorder;

(2) The administration of medication represents a reasonable exercise of professional judgment; and

(3) *Without the medication, the individual is at substantial risk of continued hospitalization because of:*

*(i) Remaining seriously mentally ill with no significant relief of the mental illness symptoms that cause the individual to be a danger to the individual or to others; [or]*

*(ii) Remaining seriously mentally ill for a significantly longer period of time with mental illness symptoms that cause the individual to be a danger to the individual or to others . . . "*

(Emphasis added).

Section 10–708(h)(1) requires that the panel base its decision on "its clinical assessment of the information contained in the individual's record and information presented to the panel." Subsection (h)(3) adds that the panel may not approve the administration of medication if "alternative treatments are available and are acceptable to both the individual and the facility personnel who are directly responsible for implementing the individual's treatment plan."

There does not seem to be any serious dispute here that the medications, or at least some of them, were prescribed by a psychiatrist for the purpose of treating Kelly's mental disorder. Nor, other perhaps than as a part of his claim that the panel applied the wrong standard in its consideration of his alleged dangerousness to self or others, has he directly attacked the panel's conclusion that administration of the proposed medication represents a reasonable exercise of professional judgment. The basic issue in this case is whether the panel and the ALJ erred in concluding that, without medication, which Kelly refused to take based on his belief that he was not mentally ill at all, Kelly would be at substantial risk of continued hospitalization because either (1) he would remain seriously mentally ill with no significant relief of mental illness symptoms that cause him to be a danger to himself or others, or (2) he would remain seriously mentally ill for a significantly longer period of time with mental illness symptoms that cause him to be a danger to himself or others. In that regard, the more specific issue is whether, in determining whether his symptoms cause him to be a danger to himself or others, the panel and the ALJ are limited to determining dangerousness

in the context of his confinement in the hospital or may consider whether, if released, he would be a danger to himself or others in the community.

The panel in this case confirmed a mental disorder that consisted of Delusional Disorder, Persecutory and Grandiose Type, based upon the following symptoms: "Delusions regarding his criminal case, that his charges were falsely pressed against him; delusions regarding having special abilities; that his attorney and the judge are involved in the case against him." Upon that diagnosis, it approved nine medications, six of which were to treat the symptoms of his mental disorder. Although we may infer that the panel members knew the nature of and purpose for each medication, it made no findings in that regard with respect to the individual medications— what each was intended to do, individually or in combination with the other medications or therapies. Rather, the panel determined generally that the benefits of taking those medications "include reduction in the symptoms of his mental disorder" and that the benefits of refusing the medications "would include lack of exposure to side effects." The panel found that alternative treatment—milieu therapy and psychoeducational efforts—had not been effective.

The critical finding of the panel was that, without the recommended medications, Kelly would be at substantial risk of continued hospitalization because of (1) remaining seriously mentally ill with no significant relief of the mental illness symptoms that cause him to be a danger to himself or others and (2) remaining seriously mentally ill for a significantly longer period of time with mental illness symptoms that cause him to be a danger to himself or others.

On the record available to us, it appears that those findings were conclusory in nature. We may assume that the panel had before it Kelly's medical and hospital records, but those records are not before us. The record that we have (and that the Circuit Court had) contains no delineation of the nature and purpose of the various medications, much less any clear, factually supported estimate of whether they would likely be

effective in sufficiently ameliorating Kelly's symptoms to the point of hastening his release by the court pursuant to CP § 3–106(b).

Kelly appealed the panel's decision. At a hearing before an Administrative Law Judge (ALJ), Dr. Robert Wisner–Carlson, Kelly's treating psychiatrist, testified at some length, commencing with his views about Kelly's prognosis:

"We have to talk about the prognosis for delusional disorder in general. There has been some controversy about that. Delusional disorder is a chronic condition and without treatment tends to go on for years and decades once it starts, although it can wax and wane some. It is thought that it doesn't respond—it has been felt that it doesn't respond well to treatment, but indeed more modern studies have indicated that that really relates to the patient's noncompliance with medication treatment.

And with medication treatment, it is fairly treatable, and that's been my experience treating the condition. So without treatment, his prognosis is poor. With treatment, he has a moderate prognosis."

When asked about the treatment for Kelly's mental illness, Dr. Wisner–Carlson responded:

"The main treatment is the medication. He's also—and that medication right now is Risperidone. And the current dose is eight milligrams. And he also takes a medication, Benztropine, for side effects, and the dose of that is one milligram. He's involved in various group therapies on the ward, types of informal, individual therapy—individual therapy of the ward, and the privilege level system, which is a form of behavior therapy, if you will."

The doctor added that, of the nine medications approved by the panel, three were actually prescribed for oral admission, with "back-up medication that he would receive if he refused the oral medication and did not agree to take it by mouth." When addressing the benefit of the medications and their side effects, Dr. Wisner–Carlson opined that "the anticipated benefits are to treat his mental disorder and to—to the point that

he could be allowed to be discharged from the hospital" and that "he's had minimal side effects from the medication."

In summary, Dr. Wisner–Carlson asserted that Kelly would continue to respond and improve with medication but that, without medication he was at a substantial risk of continued hospitalization because of remaining seriously ill (1) with no significant relief of symptoms causing himself to be a danger to himself or others, and (2) for a significantly longer period of time with symptoms causing himself to be a danger to himself or others, and further, that without medication Kelly could not be discharged to a less restrictive setting.

After the hearing, the ALJ concluded, as a matter of law, that the hospital had shown by a preponderance of the evidence that Kelly should be medicated with the psychotherapeutic drugs approved by the panel. She found that Kelly was, in fact, delusional, that the proposed medications were prescribed for the purpose of treating the delusions, and thus Kelly's mental disorder, and that the side effects of those medications were not so severe as to make their administration unreasonable.[17]

Kelly argued before the ALJ that, in determining whether, for purposes of HG § 10–708(g)(3)(i) and (ii), a finding had to be made that, absent the medication, Kelly would be dangerous to himself or others *while confined in the hospital,* rather than to the public at large upon any release. The ALJ concluded that was not necessary, and that she could rely on the finding of dangerousness made by the court after the competency hearing. That was critical, for the evidence showed that Kelly had not been in seclusion or restraints, had not been on any special observation, and had not had any special intervention in regard to assaultiveness, and yet, even while not taking the medications, he had never threatened or assaulted anyone in the hospital.

---

**17.** Kelly had been on the medication previously and had been monitored for side effects. He claimed that on one night he felt unwell, but the evidence showed that, by taking two Tylenol pills, the symptoms disappeared.

Relying entirely on the decision of the Court of Special Appeals in *Martin v. Dept. of Health,* 114 Md.App. 520, 691 A.2d 252 (1997)—a decision that this Court later vacated *(see Dept. of Health v. Martin. supra,* 348 Md. 243, 703 A.2d 166) and that therefore has utterly no precedential value—the Circuit Court for Baltimore City, in Kelly's action for judicial review, reversed the ALJ's decision and concluded that HG § 10–708(g) "require[s] evidence that an involuntarily committed individual is a danger to himself or others *in the facility to which he has been involuntarily admitted,* rather than to society generally upon his release." (Emphasis added.)

The question framed by the Department and addressed by the Court in this appeal is whether the Circuit Court erred in requiring the Department to show "that an involuntary patient is a danger to himself or others *in the facility* before the patient may be forcibly medicated when, without medication, the patient will remain hospitalized indefinitely." (Emphasis added.) As noted, I think that is too broad a question. I believe that there is a threshold question which must be answered before the question framed by the Department can properly be considered: what is the purpose of each medication proposed to be forcibly administered? Is it for patient management in the hospital or for broader therapeutic purposes, and if it is for the latter, is it likely to be effective? This is, to me, a critical distinction. If the medications are for patient management purposes, the panel, the ALJ, and the court on judicial review need consider only the dangerousness of the patient within the hospital, for that is all that is relevant.

If it is asserted, however, that the medications are being prescribed for the purpose of ameliorating the symptoms that preclude the patient from being released because, so long as the patient suffers from those symptoms, he or she will continue to be dangerous to self or others *in the community,* the panel, ALJ, and court must necessarily look to dangerousness outside of the hospital setting. Otherwise, § 10–708(g)(3) would have no meaning.

In that subsection, assuming the conditions in subsections (g)(1) and (2) are met, the Legislature has affirmatively authorized forcible medication upon a finding that, without the medication, the patient is "at substantial risk of continued hospitalization" because of remaining seriously mentally ill (1) "with no significant relief of the mental illness symptoms that cause the individual to be a danger to the individual or to others" or (2) "for a significantly longer period of time with mental illness symptoms that cause the individual to be a danger to the individual or to others." When the patient is under court commitment pursuant to CP § 3–106, the issue of dangerous for purposes of HG § 10–708(g)(3) *must* be viewed from the perspective of the community, *because that is what will control the patient's release.* Without focusing on that, no finding could ever be made under § 10–708(g), and there could therefore never be any forcible medication of such a patient except in an emergency situation under HG § 10–708(b)(1) or strictly for behavior control.

Kelly, and to some extent the Court, place weight on some language in *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). That case, to me, is largely irrelevant. It dealt with the forced medication of a mentally ill prison inmate, who would remain incarcerated to serve his term with or without the medication. Naturally, the State's focus and that of the Supreme Court was on dangerousness within the institution; no other focus would be relevant. HG § 10–708(g) *does* provide, and, to me, *requires,* a different focus, at least when the patient was committed pursuant to CP § 3–106.

The legislative history of HG § 10–708, recounted by the Court, demonstrates that the Legislature intended to put tight reins on the forced medication of involuntarily committed patients and not to allow the kind of regime portrayed in *One Flew Over The Cuckoo's Nest.* If the doctors believe that forced medication is necessary, it is incumbent upon them to establish precisely why the medication is both necessary and would be effective to achieve the objective set forth in the statute. Bald, general, unsupported opinions that the medi-

cation is necessary or would be helpful do not suffice. The record should contain clear evidence of what each proposed medication is designed *and effective* to do, alone or in combination with other medications and therapies, and precisely how and why, without that medication, the conditions stated in § 10–708(g)(3) will, in fact, exist. The record before us fails to show that such evidence was presented to the panel, and even the record before the ALJ, which is somewhat more detailed, is legally insufficient. That is why I would affirm the judgment of the Circuit Court.

Judge HARRELL has authorized me to state that he joins in this concurring opinion.